**In the Interest of: D.O. and K.N., Minors.**

**J.O., Natural Father, Appellant,**

v.

**Taney County Juvenile Office, and Missouri Department of Social Services, Children's Division, Respondents.**

Nos. SD 30077, SD 30079.

Missouri Court of Appeals,
Southern District,
Division One.

July 13, 2010.

Randy Anglen, Branson, MO, for Appellant.

Joseph W. Allen, Branson, MO, for Respondent Taney Cnty.

Juvenile Office, and Jon T. Wagner, Springfield, MO, for Respondent Missouri Dep't of Soc. Servs., Children's Div.

DON E. BURRELL, Judge.

Jeremy Oster ("Father") appeals separate judgments terminating his parental rights to and over two of his children, D.O. and K.N. (collectively, "the children" or "the girls"). K.N. was taken into protective custody in November of 2003. D.O. was taken into protective custody one month later. Father asserts seven points of alleged trial court error in these cases we have consolidated for purposes of appeal. We address only those that are dispositive of the appeal. Because the juvenile officer failed to prove by clear and convincing evidence that Father severely or recurrently abused D.O. (the grounds for termination asserted in her petitions), and because the trial court's finding that termination of Father's parental rights was in the best interests of the children was against the weight of the evidence, we reverse the judgments.

**Facts**

While it is certainly true that "[a]ppellate courts should review conflicting evidence in the light most favorable to the judgment of the trial court[,]" *In re K.A.W.*, 133 S.W.3d 1, 11–12 (Mo. banc 2004), because our ultimate conclusion is that the evidence supporting the grounds pleaded for termination in these cases "simply does not 'instantly tilt the scales in favor of termination when weighed against the evidence in opposition[,]' " *In re T.A.S.*, 62 S.W.3d 650, 661 (Mo.App. W.D.2001) (quoting *In re A.H.*, 9 S.W.3d 56, 59 (Mo. App. W.D.2000)), we will set forth evidence both favorable and unfavorable to the trial court's judgments.

In November of 2003, K.N. and D.O. were residing with their maternal grandparents. An anonymous hotline call was made concerning grandparents' home that brought the children to the attention of the Children's Division of the Missouri Department of Social Services ("the Division"). K.N. was taken into protective custody on November 18, 2003, because her mother, H.O., "was exhibiting behaviors that indicated she might be high on drugs." D.O. was taken out of her grandparents' home that same day by Father, who had legal custody of her at the time.

At the time K.N. was removed from her mother's custody, Father did not know that he was K.N.'s father, and someone else had been listed as the biological father on K.N.'s birth certificate. After K.N. came into care, genetic testing was conducted and revealed that Father was

K.N.'s biological father. Father "appeared to be happy about this and eager to participate in visits with her along with [D.O.], who is the sister of [K.N.]." No evidence was presented that K.N. had ever been in Father's custody or had been exposed to any of the abuse that D.O. later endured.

One month after D.O. began residing with Father, Father fell behind in his rent payments and decided to move in with a woman he worked with at Sonic, Karrie Byers. Ms. Byers had three children, and she and Father would care for each other's children when the other parent was at work. Father and Ms. Byers "dated" for two or three weeks, but Father testified that they actually resided together for less than a week.

Father testified that shortly after he and D.O. moved in with Ms. Byers, Father went to work and left D.O. in Ms. Byers's care. Ms. Byers later called Father at work to inform him that D.O. had fallen. When Father arrived home after completing his shift, he checked on D.O. and did not observe any unusual wounds or injuries on her. When Father was at work the next day, Ms. Byers again called to inform him that one of Ms. Byers's children had bitten D.O. Upon arriving home, Father observed a bite mark on D.O.'s cheek but "figured that her children were just playing around[.]" A few days later, Ms. Byers again called Father at work and told him that D.O. had fallen out of her crib. Father looked at D.O. when he came home, but saw no unusual injuries.

On December 15, 2003, Ms. Byers again called Father at work and told him that D.O. had fallen, bumped her head on a table, and burned her ear. This time, Father got permission to leave work early and went directly home. According to Father, when he arrived, D.O. was lying down in the bedroom. The door to the bedroom had been closed and D.O. was covered from head to toe with a blanket. Ms. Byers was watching TV and tried to keep Father from going into the bedroom to check on D.O. Finally, after watching television for as much as an hour-and-a-half, Father entered the bedroom, shook the bed, called D.O. to come to him, and she threw the cover back. D.O. came running to him, and Father saw that she was severely bruised and that both of her ears were burned. Father said he was furious, grabbed D.O., "got as much stuff as [he] could and [he] loaded up the car." After Father had finished packing up the car, he and D.O. left Ms. Byers's residence. Father went from Ms. Byers's home to see the "police commissioner" in Rockaway Beach. After speaking with the law enforcement officer in Rockaway Beach, Father did as the officer recommended and took D.O. to the hospital in Branson.

When Father was undressing D.O. in the hospital's examination room, he saw additional bruising on D.O.'s body. According to Father, he had not bathed D.O. or changed her diapers for a period of time because Ms. Byers had been "doing all of that."

Mitzi Huffman, a nurse practitioner who examined D.O. in the emergency room ("NP Huffman"), testified as to the severity and extent of D.O.'s injuries. NP Huffman observed approximately 52 bruises on D.O.'s body. In NP Huffman's opinion, D.O.'s injuries had occurred at different times. She testified that some of D.O.'s injuries were recent, some were several days old, and some were up to two weeks old. The bruises NP Huffman observed were of different colors: purple, green, bronze, and brown, colors which, in her opinion, evidenced bruises of different ages.

NP Huffman testified that the purple coloring occurs about two-to-three days af-

ter an injury, whereas the green color represents a bruise that is within one week of the injury. In NP Huffman's opinion, a bronze colored bruise is one that is about a week-and-a-half old, and a brown bruise is about two weeks old. NP Huffman observed a burn on D.O.'s entire ear that, in her opinion, was consistent with a non-accidental injury. She also described an abrasion from the top to the bottom of D.O.'s nose and stated that the injury was consistent with a non-accidental injury caused by a downward blow. NP Huffman also testified that D.O. had patches of hair missing from her scalp. She said these bare patches would have been readily apparent to an adult because D.O.'s hair was rather thin and an adult would be observing her head from above.

Dr. Thomas Huffman, a physician and surgeon, was also present during the examination of D.O. Dr. Huffman testified that, in his opinion, the bruises on D.O.'s arm, shoulders, and the left side of her face were between ten days to two weeks old. Dr. Huffman testified that the burn to D.O.'s right ear was between three and seven days old, whereas the burn to her left ear occurred in the range of "[e]ighteen hours, plus or minus six hours" before the photograph of the injury was taken. Dr. Huffman concluded that the majority of D.O.'s injuries occurred over at least a two-week period. D.O. was not allowed to go home with Father and was taken from the hospital by an employee of the Division.

The next day, Father was questioned by Detective Brian Bailey of the Taney County Sheriff's Office. Father's interviews

with Detective Bailey were videotaped. The videotaped interviews were admitted into evidence at trial and are part of the record on appeal. During the juvenile officer's cross-examination of Father about his recollection of what he had said in his interviews with Detective Bailey, the trial judge cut off further testimony regarding Father's interviews with Detective Bailey and stated he would view the videotapes and draw the inferences he thought appropriate from them.[1]

Before the court cut short this line of testimony, Detective Bailey said that Father told him that he had started to become suspicious about D.O.'s injuries one week after he began residing with Ms. Byers. Detective Bailey said Father expressed that he had concerns that Ms. Byers might kill D.O., that D.O.'s behavior had changed in the weeks they had lived with Ms. Byers, and that D.O. was frightened of Ms. Byers and was afraid to be left alone with her.

According to Detective Bailey, when he asked Father about the injuries to D.O.'s shoulder area, upper arms, groin area and buttocks, Father admitted that the injuries were probably caused by him during times that when he was frustrated or angry with D.O. and that he would forcibly pick D.O. up and then forcibly put her down on the floor. Father allegedly told Detective Bailey that he would become frustrated when Ms. Byers told him to make D.O. be quiet, so he would jerk D.O. up from wherever she was sitting or lying. During the interview, Father is said to have made several statements to the effect that he "might

1. Although Father has urged this court to review the videotaped interviews, we have chosen not to do so because we find that even if Detective Bailey's version of what those interviews contained is taken as true, and had been believed by the trial court, no evidence was presented that would support a conclu-

sion that the physical abuse of D.O. allegedly committed by Father in December of 2003 was predictive of a likelihood that D.O. (or K.N.) continued to be at risk of physical abuse by Father at the time of trial in February of 2009.

have" caused the bruises or "probably did" cause the bruises. According to Detective Bailey, Father admitted that he was probably the cause of the injuries to D.O.'s arms, shoulder area, groin, and buttocks area.

After failing a "voice stress test," Father is said to have admitted to Detective Bailey that he and Ms. Byers had been in an argument, during which Ms. Byers was upset because D.O. "would not be quiet." Father, in an effort to quiet her, picked D.O. up and forcefully put her down on the floor, at which point she struck her forehead, giving D.O. a bloody nose. Father is then said to have admitted that he took D.O. into the bedroom and forcefully placed her in her crib, causing her to hit the side of her head and back against it.

Detective Bailey also interviewed Ms. Byers on videotape. According to Detective Bailey, Ms. Byers told him that she had witnessed Father push D.O. down, slam D.O.'s face into the floor (resulting in a bloody nose), throw D.O. into the crib, causing her head to hit the side of the crib, slap Ms. Byers's four-year-old son, and kick another child. Ms. Byers's children were also taken into protective custody as a result of the injuries suffered by D.O.

Deanna Sandridge, a Division worker assigned to the case, transported Ms. Byers's two young boys in her car. During that car ride, she asked the boys what had happened to D.O. The boys stated that their mother had thrown D.O. into the heater and had pulled D.O.'s hair. They were very upset and were crying when they spoke about the incident. When Ms. Sandridge asked the older of the two boys if he meant that Father had pulled D.O.'s hair, he replied, "No, my mommy did."

The Division prepared an initial parenting service agreement for Father on January 2, 2004, and a second one on February 2, 2004. These agreements required Father to maintain regular contact with the children, obtain a psychological evaluation, "resolve" his "legal issues" (Father was arrested, charged with child endangerment, and spent six weeks in jail as a result of the December 15th incident), cooperate with the Division, and maintain housing and employment. Father missed approximately five of his weekly visits with the girls between 2005 and 2007. When Father lacked other transportation, he walked several miles to attend the visits.

Father completed his psychological evaluation and maintained stable housing and employment. The only part of Father's service agreements that the Division believed Father had not been making progress on was in resolving his legal problems. Father eventually pled guilty to the class C felony of "Endangering the Welfare of a Child" and was placed on a five year term of probation. The charge to which Father pled guilty alleged:

> [O]n or about the 15th day of December, 2003, in the County of Taney, State of Missouri, the defendant knowingly acted in a manner that created a substantial risk to the life, body and health of D.O. [,] a child[ ] less than seventeen years old, by placing the child under the care and control of Kerrie Byers when he had the knowledge that Kerrie Byers was continuously abusive to D.O.

Division social worker Samantha Woodsome was assigned to assist Father in working on his service agreements. Ms. Woodsome supervised visits between Father and the children every other week during the period of July to November of 2007. Ms. Woodsome was asked at trial, "In your professional opinion, does [sic] [K.N.] and/or [D.O.] show any emotional ties to [H.O.] or [Father]?" Her answer was, "No, sir."

Bobby Davis, a Division foster care worker assigned to the children's cases, testified that Father's first service agreement was drafted with a case goal of reunifying D.O. with Father. The second service agreement was drafted with a view toward a case goal of granting the maternal grandparents guardianship over the children. Father was hesitant about the revised case goal, but eventually agreed to support it.

Mr. Davis testified that, throughout these cases, those working on them were still "uncertain about who had actually abused [D.O.]." He stated that the Division was "stuck" in these cases because it was prohibited by law from placing children with a parent who had been convicted of felony child endangerment. Mr. Davis testified that there were "certain laws" that prevented the Division from "placing the child back in a home with someone who gets a felony charge against them, so to place [D.O.] back in the home would have been more detrimental if [Father] had a charge against him and then [D.O.] would have to be removed probably." In fact, it was Mr. Davis's belief that the Division could not permit a parent who had pled guilty to a felony child endangerment charge to have overnight visits or any other type of unsupervised visitation with his or her child.

It was apparently due to these beliefs that "the team"[2] felt "kind of stuck"— maintaining the *status quo* while the criminal charge was pending against Father, seeing if it would resolve in his favor, but not daring to return the children to him in the meantime because the team believed the children would have to be removed from Father if he were eventually found guilty of the offense with which he had been charged. Father testified that he eventually pled guilty to the offense because his public defender advised him that this would be the fastest way to get his legal issues resolved.

Ms. Byers, who was subpoenaed by the juvenile officer, appeared at trial but chose to exercise her fifth amendment right not to incriminate herself, refusing to answer any questions about the part she had played in what had happened to D.O. on December 15, 2003.

The petitions to terminate Father's parental rights to and over D.O. and K.N. sought termination pursuant to Section 211.447.4(2),[3] due to a "severe act or recurrent act of physical abuse." The factual averments set forth in the petitions were:

> Said child, [D.O.], on December 16, 2003 was brought into Skaggs Hospital with bruises on her head, shoulders, hip area, buttocks, and back in various stages of healing. The juvenile also had burns on her right ear, and two smaller burns on her neck and genital area. It was determined by Lakes Area Child Advocacy Center these injuries were a result of abuse and this abuse occurred while in the custody of [Father].

The petitions further stated that "[Father] pled guilty on June 8, 2006 to Endangering the Welfare of a Child in the first degree, a class 'C' felony in violation of Section 568.045 RSMo." Finally, the petitions alleged that termination of Father's parental rights was "in the best interest of said minor child, [D.O. and K.N., respectively]."

In support of its judgment terminating Father's parental rights to and over D.O.,

---

2. According to Mr. Davis, "the team" consisted of "[him]self, Guardian ad Litem, juvenile officer, [Father], any attorneys, counselors, so forth."

3. Unless otherwise indicated, all statutory references are to RSMo, Cum.Supp.2006.

the trial court made the following findings of fact pursuant to section 211.447.4(2):

a. That on December 15, 2003, [D.O.] was brought into Skaggs Hospital with bruises on her head, shoulders, hip area, buttocks and back in various stages of healing. [D.O.] also had burns on her right ear and two smaller burns on her neck and genital area. [D.O.] also had two different sets of bite marks on her body. It was determined by Dr. Larry Huffman at the Lakes Area Child Advocacy Center that there were approximately 47 injuries on the baby's body that were consistent with child abuse including several areas on the head where it appeared that the hair had been pulled out.

b. [Father] had legal custody of [D.O.].

c. According to Dr. Huffman[,] the injuries caused by the abuse had been going on for a period of two weeks with the newest of the injuries being very recent.

d. The biological father had recently moved into a house with his babysitter/girlfriend and her three children.

e. According to the testimony of the father, he noticed the signs of abuse for approximately five days with the serious ones happening on the [sic] December 15th, 2003.

f. On December 15, 2003[,] the father received a call at work at about noon from his girlfriend/babysitter that the child had fallen and burned herself. He left work at about 2:30 p.m. [and] watched television for approximately one and one half hour before he actually checked on the child. Then when he observed the child[,] he loaded the child up and some other possessions and went to Rockaway Beach to look for the police commissioner on his way to the hospital, and then took the child to the hospital.

g. [D.O.] has been diagnosed with Major Depression, Recurrent, Reactive Attachment Disorder and Post Traumatic Stress Disorder. Her younger sister [K.N.] was diagnosed with Reactive Attachment Disorder and Post Traumatic Stress Disorder.

h. The biological father, [Father], pled guilty on June 8th, 2006[,] and was sentenced on June 8th, 2006[,] to the class "C" felony of Endangering the Welfare of a Child in the first degree in violation of section 568.045 RSMo.

i. The termination of parental rights of the biological father, [Father], is in the best interest of the minor child, [D.O.].

The trial court further found that there were "very few emotional ties with the child to the birth parent in the last five years, although he has requested more visitation and has been regular but only on a one hour a week visitation." The trial court found that Father had "provided no support for the child since the child was taken into custody [ . . . ] fathered two other children [ . . . ] and the child he had with the girlfriend/babysitter he no longer visits." The trial court found that Father showed disinterest and lack of commitment to the child due to "this total lack of support." The trial court found that [D.O.]'s counselor "recommended that visitation with [Father] stop"[4] and that the "deliberate actions of [Father] have 'subjected' [D.O.] to substantial risks of physical and mental harm." The trial court concluded that "[t]his child [D.O.] has been in the custody of [the Division] for over 5 years. The trial court is not going to

4. There was evidence presented at trial that the juvenile officer sent correspondence to the children's counselor specifically requesting a letter that suggested visitation between Father and the children should stop.

return [D.O.] to [Father]. The child needs permanency."

In its conclusions of law, the trial court found "based on clear, cogent and convincing evidence that the allegations contained in the Petition to Terminate Parental Rights are true and that statutory grounds for the termination of [the parental rights of [Father] exist." The trial court "further found that termination of parental rights is in the best interests of [D.O.]." The trial court's judgment with its attendant findings of fact and conclusions of law terminating Father's rights to and over K.N. was virtually identical, citing Father's involvement in the abuse to D.O. as the ground for also terminating Father's rights to and over K.N.

## Analysis

Section 211.447, the statute governing actions to terminate parental rights, was modified after the juvenile officer filed her petitions in these cases. No amended petitions were filed, but the parties have stipulated that the portion of the revised termination statute applicable in the instant case is section 211.447.5(2). The only change resulting from the amendment that has application in this case is the renumbering of the alleged grounds for termination from 211.447.4, RSMo 2000, to 211.447.5. In this opinion, we will cite cases that refer to either section without any further explanation regarding the difference in numbering. For ease of analysis, we address Father's points out of order.

### Standard of Review

■■■ "In a termination proceeding, the circuit court, before considering the child's best interest, must determine whether or not the grounds for termination are supported by clear, cogent, and convincing evidence." *In re C.K.*, 221 S.W.3d 467, 471

(Mo.App. W.D.2007). "Clear, cogent and convincing evidence in an action for termination of parental rights is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In re A.H.*, 9 S.W.3d at 59. This court will affirm a judgment terminating parental rights unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re S.M.H.*, 160 S.W.3d 355, 362 (Mo. banc 2005) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)); *In re T.A.S.*, 62 S.W.3d at 655 (citing *In re N.M.J.*, 24 S.W.3d 771, 777 (Mo.App. W.D. 2000)). "We must be extremely cautious in considering the setting aside of a judgment on the ground that it is against the weight of the evidence. We should do so only if we have a firm belief that the judgment is wrong." *In re W.S.M.*, 845 S.W.2d 147, 150 (Mo.App. W.D.1993).

■■■ "We review termination of parental rights cases closely because termination of parental rights interferes with a basic liberty, freedom from governmental interference with family and child rearing." *In re C.K.*, 221 S.W.3d at 471. "Terminating parental rights is an exercise of an awesome power and should not be done lightly." *Id.* (quoting *In re P.C.*, 62 S.W.3d 600, 602–03 (Mo.App. W.D.2001)). "Statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *In re K.A.W.*, 133 S.W.3d at 12. "Strict and literal compliance with the statutory requirements, relating to termination of parental rights, is necessary." *In re F.M.*, 979 S.W.2d 944, 946 (Mo.App. S.D.1998).

*Pleaded Grounds for Termination*

 The relevant portion of section 211.447.5 allows a court to terminate parental rights if:

. . . .

(2) The child has been abused or neglected. In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:

(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;

(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development[.]

Section 211.447.5(2). "The court is required to make specific findings on *each* of these four factors." *In re K.A.W.*, 133 S.W.3d at 16 (quoting *In re T.A.S.*, 32 S.W.3d at 810) (emphasis in original).[5]

 Father's first point on appeal alleges the trial court erred in concluding that the juvenile officer had proven by clear and convincing evidence that Father had abused D.O. The petitions to terminate Father's parental rights to and over D.O. and K.N. sought termination pursuant to a portion of what is now section 211.447.5(2)(c): a "severe act or recurrent acts of physical abuse." Although the trial court's judgments indicate that Father's parental rights to and over D.O. and K.N. were being terminated due to "A Severe Act Or Recurrent Act[s] of Physical Abuse," they nowhere state that Father committed any act of abuse. Instead, the trial court simply recites D.O.'s injuries and that Father testified that "he noticed the signs of abuse for approximately five days with the serious ones happening on the [sic] December 15th, 2003."

---

5. Father's sixth point of alleged error correctly argues that the trial court erred by failing to make specific findings on each of these four statutory factors. "Section 211.447.2(2) requires that the court make findings with reference to all of the subparagraphs under that subsection, even if they are irrelevant to the facts of that case." *In re A.M.C.*, 983 S.W.2d 635, 638 (Mo.App. S.D.1999). Here, the trial court's judgments failed to make any findings at all in regard to factors a, b, and d. Because strict and literal compliance with all statutory provisions is required in actions involving the termination of parental rights, this defect alone would require us to reverse the judgment and remand the matter for additional findings. *See In re H.R.R.*, 945 S.W.2d 85, 89 (Mo.App. W.D.1997); *In re W.S.M.*, 845 S.W.2d 147, 152 (Mo.App. W.D.1993); *In re A.M.C.*, 983 S.W.2d at 638. However, there are more substantive problems with the court's judgments and, as in *A.M.C.*, such a remand is not necessary because the evidence in the record on the ground asserted for termination does not "rise to the level of clear, cogent and convincing." 983 S.W.2d at 638.

■ Although parental rights may also be terminated pursuant to section 211.447.5(2)(c) if a parent "knew or should have known that such acts [of abuse] were being committed toward the child or any child in the family[,]" that alternative ground was not asserted against Father in the juvenile officer's petitions—the petitions alleged only that Father personally abused D.O., not that he failed to take action to prevent someone else from doing so.

[D]ue process requires that "[t]he petition in a termination of parental rights case should contain allegations likely to inform those persons involved of the charges, to the end that objection may be prepared." *In Interest of D.M.J.,* 683 S.W.2d 313, 314 (Mo.App.1984) (quoting *In Interest of W.F.J.,* 648 S.W.2d 210, 216 (Mo.App.1983)). For this reason, we have previously recognized that it is necessary to terminate on a ground asserted in the Petition. *See, e.g. In Interest of M.K.P.,* 616 S.W.2d 72, 77 (Mo.App.1981) (where Petition alleged abandonment but also contained language which asserted that the parents had neglected to see the child for more than a year and had neglected to provide proper support, education, and care, Order terminating rights due to failure to rectify conditions which led to assumption of jurisdiction was not based on a different ground for termination than that contained in the Petition and therefore was not improper).

*In re H.R.R.,* 945 S.W.2d 85, 89 (Mo.App. W.D.1997).

In reliance on the grounds for termination alleged in the juvenile officer's petitions, Father's defense was that Ms. Byers was the person who abused D.O. and that Father left the situation as soon as he realized that Ms. Byers was responsible for D.O.'s injuries. In light of the theory on which the case was prosecuted and defended, the trial court clearly erred in failing to make factual findings as to whether Father inflicted the various injuries suffered by D.O. Instead, the trial court referred to Father's conviction, a conviction based on an allegation that "[Ms.] Byers was continually abusive to D.O."

By failing to specifically find that Father abused D.O., it suggests that the trial court may not have found credible Officer Bailey's testimony that Father had confessed to causing D.O.'s injuries, believing instead that Ms. Byers had caused them and that Father should have realized what was happening and removed D.O. from Ms. Byers's control more quickly than he did. As a result, the trial court's findings are inconsistent with its conclusion that "based on clear, cogent and convincing evidence[,] the allegations contained in the Petition[s] to Terminate Parental Rights are true...."

### *Mere Showing of Past Abuse is Insufficient*

Even if the trial court had found that Father had directly abused D.O., Father's fifth point on appeal alleges the trial court would still have erred in terminating his parental rights because any such abuse occurred over a one week period of time more than six years before his rights were eventually terminated. Citing *In re K.A.W.,* Father asserts that the trial court looked solely at past conduct and did not take into account the circumstances as they existed at the time of trial.

■ Father correctly argues that "it is insufficient merely to point to past acts, note that they resulted in abuse or neglect and then terminate parental rights." *In re K.A.W.,* 133 S.W.3d at 9. "Past behavior can support grounds for termination, but only if it is convincingly

linked to predicted future behavior. There must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm." *Id.* at 9–10. "Courts have required that abuse or neglect sufficient to support termination under section 211.447.4(2) be based on conduct at the time of termination, not just at the time jurisdiction was initially taken." *Id.* at 10; *see also In re C.A.L.*, 228 S.W.3d 77, 80 (Mo.App. S.D.2007).

Based on this requirement, Father's counsel moved for a directed verdict at the close of the juvenile officer's evidence, arguing that she had only presented evidence of abuse that happened in 2003 and did not include any evidence that would indicate a likelihood of current or future harm. The juvenile officer's counsel responded that D.O. "was in [Father's] care for about three weeks and they lived in this—in this place with his girlfriend, and that's what happened. You see the pictures [of D.O.'s injuries]. So when he's had this shot, she was there for three weeks and you see the result, I believe that far and above shows an indication of what's—what could happen in the future and that it is certainly in [sic] not in either child's best interest to be in the care and custody of [Father]." The trial court denied Father's motion for a directed verdict.

 In *In re C.K.*, *supra*, the circuit court terminated M.T.'s parental rights based on evidence obtained several years prior to the time of trial and "did not address M.T.'s current ability and willingness to parent and did not explicitly consider the potential for future harm." 221 S.W.3d at 473. As in *In re C.K.*, the trial court here terminated Father's parental

rights based solely on the events that initially brought D.O. into protective custody without assessing Father's current ability to appropriately parent D.O. and K.N. "The circuit court was required explicitly to consider whether or not the past acts indicated a likelihood that [Father] would harm [his] children in the future." [6] *Id.* at 474. A parent's efforts to comply with a parenting, reunification, or treatment plan will provide the court with an indication of a parent's likely efforts in the future to care for the child. *In re K.A.W.*, 133 S.W.3d at 10. "Such evidence cannot be irrelevant" and "it is error for a trial court to ignore it when considering termination of parental rights." *Id.*

### Father's Felony Conviction for Endangering the Welfare of a Child

The trial court's judgments refer several times to Father's having pled guilty to the crime of endangering the welfare of a child, a violation of section 568.045. Because Mr. Davis testified that "the team" felt "stuck" in this case because of Father's conviction of that offense, and because the juvenile officer actually cites Mr. Davis's testimony in her brief as support for the proposition that "the [Division] could neither place a child with a parent nor give a parent overnight or unsupervised visits when that parent had a felony child endangerment conviction[,]" we believe the trial court's judgments may have resulted from a misapplication of the law.

Section 211.038 (effective date September 15, 2005) provides, in pertinent part:

1. A child under the jurisdiction of the juvenile court[7] shall not be reu-

---

6. We note that the trial court was in an unusually good position to assess Father's likelihood of future harm in these cases as it had more than five years of Father's actual subsequent behavior to examine. In many cases, this duty to prognosticate is pressed upon the trial court with as little as one year of subsequent behavior to review.

7. As Missouri no longer has a "juvenile court," *see Robinson v. Director of Revenue*,

nited with a parent or placed in a home in which the parent or any person residing in the home has been found guilty of, or pled guilty to, any of the following offenses when a child was the victim:

(1) A felony violation of section 566.030, 566.032, 566.040, 566.060, 566.062, 566.064, 566.067, 566.068, 566.070, 566.083, 566.090, 566.100, 566.111, 566.151, 566.203, 566.206, 566.209, 566.212, or 566.215, RSMo;

(2) A violation of section 568.020, RSMo;

(3) A violation of subdivision (2) of subsection 1 of section 568.060, RSMo;

(4) A violation of section 568.065[,] RSMo;

(5) A violation of section 568.080[,] RSMo;

(6) A violation of section 568.090[,] RSMo; or

(7) A violation of section 568.175[,] RSMo.

2. For all other violations of offenses in chapters 566 and 568, RSMo, not specifically listed in subsection 1 of this section or for a violation of an offense committed in another state when a child is the victim that would be a violation of chapter 566 or 568, RSMo, if committed in Missouri, the juvenile court *may exercise its discretion* regarding the placement of a child under the jurisdiction of the juvenile court in a home in which a parent or any person residing in the home has been found guilty of, or pled guilty to, any such offense.

Section 211.038.1; .2 (emphasis added). Because the section 568.045 offense to which Father pled guilty is not included among the offenses listed in section 211.038.1, whether a child may be placed with a parent who has committed such an offense has been left to the sound discretion of the trial court. Section 211.038.2.

Some of the confusion about whether the trial court was legally precluded from placing D.O. and/or K.N. with Father may have arisen from an opinion written by the western district of our court in *In re T.M.E.*, 169 S.W.3d 581 (Mo.App. W.D. 2005). In a paragraph not necessary to the court's resolution of the issues before it, the Western District stated:

> The [trial] court found, with regard to both Mother and Father, that the decision to terminate was "reinforced" by section 211.038. That statute, enacted in 2004, prohibits the court from reuniting a child with a parent who has pleaded guilty to certain felonies, including sections 568.060 (child abuse) and 568.045 (endangering the welfare of a child). The court stated that while the statute does not specifically refer to termination of parental rights, it shows a strong public policy against returning a severely and criminally abused child to the parents involved in the abuse.

*Id.* at 586. While we have no dispute with our fellow district's notion that section 211.038 recognizes a public policy against returning a severely and criminally abused child to parents who were involved in that abuse, we do note that the General Assembly specifically left section 568.045 out of the list of offenses for which a finding of guilt would absolutely prohibit placement.

Because the issue is likely to arise if any subsequent petitions are filed seeking a termination of Father's parental rights to D.O. and/or K.N., we point out that the Western District's statement that section

949 S.W.2d 907, 910 (Mo.App. S.D.1997) (noting that the Missouri Constitution was amended by a vote of the citizens in 1976 to abolish the then-existing separate trial courts and consolidate them into what is now one "circuit court"), we presume the legislature intended to refer to matters tried in the juvenile division of the circuit court.

211.038 prohibits a court from reuniting a child with a parent who has pleaded guilty to endangering the welfare of a child pursuant to section 568.045 appears to be an overstatement of what section 211.038 actually requires, was not the basis on which *In re T.M.E.* was decided, and should not be relied on.

*In re C.K., supra,* another Western District case, is more instructive. In *In re C.K.,* the children at issue were taken into protective custody after an unattended five-year-old with access to a loaded gun shot himself in the neck. 221 S.W.3d at 472. The children were living at the time in a filthy hotel room cluttered with trash and cat feces. *Id.* After the children were removed and placed into foster care, one parent, M.T., pleaded guilty to endangering the welfare of a child. *Id.* When the adoptive parents attempted to argue that the termination should be affirmed on the basis of M.T.'s guilty plea, the court addressed the matter in the following footnote:

> The adoptive parents assert that, because M.T. pleaded guilty to endangering the welfare of a child, which was a Class D [8] felony under Section 568.045, RSMo Supp.2002, clear, cogent, and convincing evidence existed for terminating M.T.'s parental rights pursuant to Section 211.447.4(4). That subsection provides parental rights may be terminated if "[t]he parent has been found guilty or pled guilty to a felony violation of chapter 566, RSMo, when the child or any child in the family was a victim, or a violation of section 568.020, RSMo, when the child or any child in the family was a victim." This section permits a court to terminate a person's parental rights when the evidence establishes that the parent has been found guilty or pled guilty to a sexual offense or incest in-

volving a child in the family. Such an offense is not involved in this case. Moreover, the petition under which the adoptive parents sought termination of M.T.'s parental rights did not allege Section 211.447.4(4) as a ground for termination.

*Id.* at n. 4.

The petitions in the cases at bar alleged "a severe act or recurrent act[s] of physical abuse" (of D.O.) and sought to terminate Father's parental rights pursuant to section 211.447.4(2)(c). The trial court's judgments terminated Father's parental rights based on "a severe act or recurrent act[s] of physical abuse." Neither petition asserted that Father's felony conviction constituted a ground for termination pursuant to section 211.447.5(4). Rather, the juvenile officer, like the Division, seemed to believe there was a statutory restriction that prevented a child from being placed with a parent who had been convicted of felony child endangerment pursuant to section 568.045. At trial, when the juvenile officer attempted to introduce photographs of the apartment Father and D.O. shared with Ms. Byers, Father's counsel objected on the grounds that the petitions did not allege neglect. The juvenile officer agreed that it had misstated what the petitions alleged and affirmed that the petitions only alleged "a severe act or recurrent act[s] of physical abuse." The criminal information to which Father pled guilty alleged that Father had "created a substantial risk to the life, body and health of D.O.[,] a child[ ] less than seventeen years old, by placing the child under the care and control of Kerrie Byers when he had the knowledge that Kerrie Byers was continuously abusive to D.O."

A guilty plea to this offense as it was charged could not provide an evidentiary

---

**8.** An offense now punishable as a class "C" felony.

basis for the trial court's termination of Father's parental rights based on the commission of a severe act or recurrent acts of physical abuse because the petitions filed against Father alleged that Father had personally committed the severe or recurrent acts of abuse suffered by D.O., not that he knew or should have known that Ms. Byers was abusing D.O. Although Father's conviction for child endangerment was certainly a factor the court could consider in determining whether terminating Father's parental rights would be in the children's best interests, the court clearly erred in relying on it as a legal ground for termination.

### Best Interests of the Children

■ Section 211.447 "[s]hall be construed so as to promote the best interests and welfare of the child as determined by the juvenile court in consideration of the following: (1) The recognition and protection of the constitutional rights of all parties in the proceedings; (2) The recognition and protection of the birth family relationship when possible and appropriate; and (3) The entitlement of every child to a permanent and stable home." *In re K.A.W.*, 133 S.W.3d at 9.

When considering whether to terminate the parent-child relationship pursuant to subsection 2 or 3 of this section or subdivision (1), (2), (3) or (4) of subsection 4 of this section, the court shall evaluate and make findings on the following factors, when appropriate and applicable to the case:

(1) The emotional ties to the birth parent;

(2) The extent to which the parent has maintained regular visitation or other contact with the child;

(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child;

(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.

Section 211.447.6.

■ The trial court "*shall* evaluate and make findings" on each of the best interests factors. *In re K.A.W.*, 133 S.W.3d at 19 (emphasis in original). As to factor seven in the best interests analysis, our Supreme Court has held that "[t]he usage of 'subjects' rather than 'subjected' underscores the importance of considering the future." *Id.* The trial court must describe how past acts indicate a future risk of harm to the children. *Id.*

### Factor One: Emotional Ties to the Birth Parent

Mr. Davis was the Division's caseworker who had the most experience with Father and the children. Mr. Davis testified that the children were hesitant when they first began having weekly meetings with Father, but they soon "welcomed him with open arms." The girls would "run up and they would give him a hug." The girls

enjoyed their time with Father and were often sad to see him leave. The juvenile officer's own termination of parental rights referral outline states, "Since the girls have been having visits with [Father], they are beginning the attachment process. When the girls first started having visits, they related the term 'dad' to their foster dad and didn't know who [Father] was. Now that they have had more consistent visits, they know that on Thursdays, they see 'dad' and know that it's [Father] they're seeing."

Shirley Ankrom–Bass, a licensed practical counselor who worked with Father, witnessed a visit between Father and his children from behind a two-way mirror. She stated there was "definitely" a bond between Father and his daughters. She testified that the girls call him "daddy" and will run up to him and grab him, and Father returns affection to them.

Shirley Brown is the "career-licensed" foster parent for D.O. and K.N. She testified that the children refer to Father as "dad" and are excited to see him. Ms. Brown also testified that D.O. and K.N. are the most difficult children she has ever had in eighteen years of being a foster parent. However, she felt that Father "did a pretty good job with the girls" and she was impressed with his ability to handle them. Ms. Brown even stated that she thought Father should be considered as a placement option for the children "because of the dedication and concern he seems to have for them."

Heather Curnutt, a children's service worker with the Christian County Children's Division, witnessed approximately twenty visits between Father and the girls. She testified that the visits had gone well, Father demonstrated appropriate behavior, the children enjoyed their time with Father, and the girls referred to Father as "Daddy Jeremy."

The only social worker who testified that there were no emotional ties between Father and his daughters was Ms. Woodsome. She did so in a two-word answer to a generic question about whether she believed there was an emotional tie between Father and the children. Ms. Woodsome provided no factual support for her conclusion and had not witnessed any interaction between Father and his daughters since 2007, nearly a year before she testified at trial. Ms. Woodsome had also requested that Ms. Brown, the foster parent, explain her positive comments about Father because she was afraid Father's attorney would subpoena Ms. Brown to testify at trial.

This is one of those admittedly rare occasions on which we are firmly convinced that, based on the nature of the testimony and the witnesses who presented it, the trial court's determination that there were no emotional ties between Father and his children was against the weight of the evidence. Contrary to the trial court's finding, the overwhelming weight of evidence was that the children did have emotional ties to Father. This factor must be viewed as weighing against termination.

*Factor Two: Extent of Regular Visitation and Contact with Children*

Father was granted visitation of one hour per week for the majority of the time the children had been in the custody of the court. The record indicates that Father missed only five of those visits during the past six years, and he frequently walked from Rockaway Beach to Branson to attend them when he did not have access to a vehicle. Father wrote letters to the children during the six week period in which he was jailed in connection with his criminal charge and also wrote to the social workers during that time period, asking to see the children. Father repeatedly filed legal motions and

wrote letters requesting more visitation time with the children. When Ms. Woodsome cut off Father's visitation, Father successfully petitioned the court to have it reinstated.[9]

After reviewing the entire record on appeal, we are also firmly convinced that the trial court's finding that Father was "disinterest[ed]" in his children was against the overwhelming weight of the evidence. In fact, we find Father's persistence in exercising his one-hour weekly visits with his children to be quite remarkable, considering the circumstances and obstacles that confronted him. This factor also weighed against termination.

*Factor Three: Extent of Payment for Cost and Care of the Children*

While there is no evidence that Father was ever court-ordered to pay child support, there is also no evidence that he paid any voluntary child support. And although the trial court made no findings in regard to Father's ability to pay any such support, his financial statements and property statements revealed that he was earning approximately $700 per month and was able to maintain stable employment.

Father did bring items of clothing to the children. The record also indicates that on at least one occasion, during the time period in which his visitation rights had been discontinued, Father attempted to give his children Christmas gifts but was told that he could not give them in person. Father said he retained the gifts on that occasion because he wanted to see his "children's faces when they opened them up."

 "Evidence that a parent has provided some contribution, even if not fully sufficient for support, demonstrates the parent's intent to continue the parent-child relationship and militates against termination." *In re S.M.H.,* 160 S.W.3d at 367. Although Father's financial support was minimal, it was sufficient to demonstrate an intent to continue the parent-child relationship. This factor is, at worst, neutral in regard to termination in this instance.

*Factor Four: Would Additional Services Bring About a Lasting Parental Adjustment Enabling a Return of the Child to the Parent within an Ascertainable Period of Time?*

Father and his current wife both testified that they were given some parenting CDs by counselor Shirley Ankrom–Bass and had listened to them. They each stated that the information contained in the CDs was helpful and that they had employed the information in rearing the child they were now rearing together. No attempt was made to show that Father's parenting of this child had been deficient or that the child was in any danger of being abused by Father.

The juvenile officer presented no evidence contrary to Father's testimony on these matters, perhaps because she mistakenly believed that Father's felony conviction rendered any such evidence irrelevant. As discussed above, this belief may have been based on the mistaken notion that Father's conviction was an absolute bar to his ever having the children returned to him. Father's history of compliance with his service agreements, along with his history of maintaining consistent employment and appropriate housing, weighed against termination.

9. Ms. Woodsome's email on December 11, 2007 stated the following: "I have called and informed [Father] to let him know that visits have been discontinued. As expected he was not happy with this and he will be calling [his attorney]. [Father] wanted to know why we don't like him and why we are ripping his kids from his heart...."

*Factor Five: Parent's Disinterest or Lack of Commitment to the Child*

As discussed in regard to Father's visitation and other contact with and concern for the children, Father has demonstrated a steadfast interest in the children and a commitment to them. There is simply no substantial evidence in the record to support the trial court's conclusion that Father's "total lack of support . . . shows the parents [sic] disinterest and lack of commitment to the child[ren]." This factor weighed against termination.

*Factor Six: A Felony Conviction that Would Deprive the Child of a Stable Home for a Period of Years*

It is undisputed that Father has a felony conviction for endangering the welfare of a child (D.O.). However, because Father was not incarcerated but placed on probation, it was not the type of conviction that would deprive the children of a stable home for a period of years. There is nothing in the record to indicate that Father has incurred any further legal problems since he was placed on probation in 2006.

At the time of trial, Father had been living in the same apartment for over three years, where he resided with his current wife and their new daughter. Father had been working at the same job for five years. There is no evidence in the record indicating that the children would be deprived of a stable home for a period of years as a result of Father's conviction.

There is also no evidence in the record to support the trial court's finding that "an adoptive home is available" for the children. On the contrary, the record indicates that due to the extreme behaviors exhibited by D.O. and K.N., they were deemed at the time of trial to be "career" foster children and had for this reason been placed with Ms. Brown, a foster parent specially licensed to meet their sub-

stantial needs. The record on appeal reveals that it was not until after the court had entered its judgments terminating Father's parental rights that a "Media Profile" was created and published by the Division in order to recruit potential adoptive parents for the children. This factor also weighed against termination.

*Factor Seven: A Deliberate Act of the Parent or Acts of Another of Which the Parent Knew or Should Have Known that Subjects the Child to a Substantial Risk of Physical or Mental Harm*

The trial court's judgments stated that "[t]he deliberate actions of [Father] have *subjected* [D.O.] to substantial risks of physical and mental harm." (Emphasis added). It is arguable that the facts the trial court cites in support of this conclusion are insufficient to support it in light of the trial court's finding that Father took D.O. and their possessions away from Ms. Byers's house the day the "serious" acts of abuse occurred and Father has apparently had no contact with Ms. Byers since that day.

However, evidence not cited in the trial court's judgments did support its conclusion that Father knowingly subjected D.O. to substantial risks of physical and mental harm—Father's guilty plea to the criminal charge that he subjected D.O. to abuse by Ms. Byers. This factor is the only one of the seven that weighed in favor of termination.

**Decision**

For the reasons outlined above, we are firmly convinced that the judgments are wrong in concluding that the allegations of the petitions were true and that a termination of Father's parental rights to and over D.O. and K.N. was in the children's best interests. The evidence "simply does not 'instantly tilt the scales in favor of

termination when weighed against the evidence in opposition.'" *In re T.A.S.*, 62 S.W.3d at 661 (quoting *In re A.H.*, 9 S.W.3d at 59). Points 1 and 5 are granted. The remaining points are moot.

The judgments terminating Father's parental rights are reversed. This reversal does not mean that physical custody of the children should forthwith be returned to Father. D.O. and K.N. remain in the custody of the Division, subject to Father's reasonable visitation as hereafter determined by the trial court, which retains jurisdiction over the children.

BATES, P.J. and BARNEY, J., Concur.