In the Interest of T___ M. E___.

**Doug BEEVERS, Juvenile Officer, Judicial Circuit 37, Respondent,**

v.

**M___ J___ H___, Appellant,**

and

**L___ D___.**

**No. 18580.**

Missouri Court of Appeals, Southern District, Division Two.

April 26, 1994.

Frederick W. Martin, III, West Plains, for appellant.

No appearance for respondent.

CROW, Judge.

The Juvenile Officer of Judicial Circuit 37 brought this action per § 211.447, RSMo Cum.Supp.1991,[1] to terminate the parental rights of M__ J__ H__ ("Mother") and L__ D__ ("Father") to their daughter, T__ M. E__, born November 23, 1982 ("Daughter").

The juvenile court[2] held an evidentiary hearing at which Mother appeared in person and with counsel. Father was served with summons, but defaulted.

The juvenile court thereafter entered an order terminating the parental rights of Mother and Father to Daughter per § 211.-447.2, which provides, in pertinent part:

> "The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer ... if it finds

---

1. The version of § 211.447 in RSMo Cum.Supp. 1991 was enacted as C.C.S.S.S. No. 2 S.C.S.H.C.S.H.B. 1370, 1037 and 1084, Laws of Missouri 1990, pp. 1108–29, and took effect August 28, 1990. It has remained unchanged since

then. In this opinion, all references to § 211.447 are to that version unless otherwise indicated.

2. "Juvenile court" means the juvenile division of the circuit court. § 211.021(3), RSMo 1986.

that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:

. . . .

(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control."

■ Mother, alone, appeals. Her sole point relied on states the proof was insufficient to support termination of her parental rights in that there was no clear, cogent and convincing evidence that the conditions which led the juvenile court to assume jurisdiction of Daughter (in 1990) still persisted when this termination action was tried (in 1992), or that conditions of a potentially harmful nature continued to exist.

■ In addressing that issue, we view the evidence in the light most favorable to the juvenile court's order, giving due regard to that court's opportunity to judge the credibility of witnesses. *In the Interest of M.E.W.*, 729 S.W.2d 194, 195–96 (Mo. banc 1987).

So viewed, the evidence establishes that Mother and Kenneth H— began living together when Daughter was "two weeks old"—early December, 1982. At that time, Mother had a son. As best we can determine from the record, he was then four or five years of age. However, he had been removed from Mother's care because of "neglect and abuse" when he was eighteen months of age and placed with Mother's sister in another state.

Mother married Kenneth on February 17, 1984.

On a date undisclosed by the record, but described by Mother as "around '87," she was diagnosed as having "bipolar disorder." Since then, she has taken medication for it.

Although the evidence is imprecise, we glean from it that Mother was placed on probation for "burglary and stealing" in 1987. We cannot ascertain whether that was before or after the diagnosis mentioned in the preceding paragraph. Mother disclosed she had an earlier conviction for another "burglary, stealing." She testified it was "in 1976, I believe."

On March 11, 1988, the Clay County office of the Division of Family Services ("DFS") received a "hot-line report" about Daughter, who was hospitalized in Olathe, Kansas. According to the DFS investigator, "[T]he family was living in a low income housing unit in Excelsior Springs." The investigator spoke with Mother about the reason for Daughter's hospitalization. According to the investigator, Mother indicated "she was having problems with [Daughter's] behavior," and that was why Daughter was hospitalized.

As we understand the investigator's testimony, Mother was also hospitalized at that time. According to the investigator, that was because of "[d]epression and psychological problems."

The investigator testified that Mother "expressed some concerns ... regarding possible sexual abuse to [Daughter]." Mother also revealed "quite a bit of domestic violence" and said there had been "several occasions in which [Daughter] had been physically hurt during the fights." One such instance had been in June, 1987, when Daughter's head had either hit, or been struck by, a coffee table, requiring stitches.

The investigator's inquiries gave her reason to believe Daughter had been molested by Todd H___, Kenneth's son. According to Mother, Todd was then fifteen, and was living with "Grandma." However, he spent weekends with Mother and Kenneth. Other evidence in the record indicates Todd would have been about eighteen, not fifteen, at the time.

Mother testified Todd admitted to her (evidently before Daughter's hospitalization) that he "had played with [Daughter's] genital area." Mother related this to the investigator.

Mother and Daughter were released from their respective hospitalizations, but the dates do not appear in the record. Mother was hospitalized again April 24, 1988, for "back surgery."

Later, on a date unrevealed by the record, Mother, Kenneth and Daughter moved to Ray County. From there, they moved to Howell County. Asked when the latter move occurred, Mother testified, "Probably '88, '89."

On February 6, 1990, Beth Coble, a social worker with the Howell County DFS office went to the home of Mother and Kenneth. Daughter was there, as was Mother's son (then age twelve or thirteen). He had been in the home since "probably the middle of January." Around February 18, 1990, Mother's son was placed under juvenile jurisdiction and removed to a boys' residential facility for "treatment of behaviors."

On March 15, 1990, Ms. Coble prepared a written treatment plan for Mother. The plan pertained to Daughter and Mother's son. Mother refused to sign it.

On July 30, 1990, Daughter was admitted to Lakeland Regional Hospital in Springfield. According to Mother, this was because Mother's psychiatrist told her that Daughter was "out of control ... had behavioral problems ... and ... needed to go to the hospital." Daughter was placed in a group therapy program conducted by Laurie Massey, a clinical social worker at Lakeland.

On August 15, 1990, the juvenile officer filed a petition in juvenile court in Howell County asking that court to take jurisdiction of Daughter. The petition averred, *inter alia*, that Daughter was in need of care and treatment because she suffered physical abuse, or the threat thereof, from Kenneth; that in February, 1988, Daughter had been hospitalized in Kansas because of aggressive behavior; that in February, 1990, Mother's son was removed from the home; that Mother had bipolar disorder and chronic depression; that Mother was on probation for burglary and stealing, and was facing a violation hearing because of a new felony; that Daughter was hospitalized at Lakeland for treatment of behavioral problems; and that Mother was unwilling or unable to provide a safe and secure environment for Daughter.

On August 29, 1990, an incident occurred at Lakeland, the details of which are not fully developed in the transcript. As we understand the testimony, one or two other children reported that Daughter simulated sexual acts with a teddy bear and a doll. According to therapist Massey, one of the children quoted Daughter as saying, "My mother, brother, and stepfather did this all the time." Massey questioned Daughter about the incident. Daughter denied it. Massey never saw Daughter "sexually act out."

According to Massey, children are often frightened when they initially get into treatment. This is because they have had threats against them, hence they do not share things until they are in a safe environment. Often, that takes years.

On September 11, 1990, a physician examined Daughter for physical evidence of sexual abuse. According to a DFS memo, the physician found the hymen intact and no scarring or evidence of tears. The memo stated, "[T]his would rule out sexual intercourse, but not oral sex or fondling."

On September 13, 1990, the juvenile court held a hearing on the petition filed August 15, 1990. Mother appeared in person and with counsel. The juvenile court made a docket entry that date which reads, in pertinent part:

> "Statement of mother no contest but confesses jurisdiction.... Statement of Guardian Ad Litem confess [sic] all allegations. Allegations on paragraphs __ only are true, juvenile is within jurisdiction of Court per Sec. 211.031. Child placed in legal custody of DFS. Child placed in physical custody of DFS."

In early October, 1990 (the date is unrevealed by the record), Daughter was discharged from Lakeland. Therapist Massey explained:

> "[Daughter's] treatment was completed. She was no longer being aggressive with other kids. She had a safe environment to return to.... we thought she was ready to go out...."

Upon release from Lakeland, Daughter was placed in foster care in the home of J__ C__ and her husband, R__, in Howell County. We henceforth refer to J__ C__ as "the first foster mother."

On October 12, 1990, Mother was sent to prison. The reason is not spelled out in the record, but we infer it was because her 1987 probation was revoked.

The first foster mother testified Daughter exhibited behavioral problems in her home. Specifically:

> "... we had company. They were all in the back yard. And [Daughter] had on a pair of shorts, and she went in the house and put on a skirt, just a little child's skirt. And she had removed her panties. And she went around in the back yard and just squatted down in front of, you know, our company.
>
> Q. Did she expose herself?

> A. ... Yes, exactly.
>
> Q. Can you think of another occasion where she was acting out sexually?
>
> A. ... I was in the house, and my son came in very upset. And I said, 'What's the matter?'
>
> And he said, 'Well, [Daughter] did that.'
>
> And I said, 'Well, what did [she] do?' And he wouldn't tell me. [Daughter] came in the house, and she was obviously upset. And I said, '... what happened?'
>
> And she said, 'Well, I did that.'
>
> I said, 'What is it you did?' And she wouldn't tell me. And I kind of pressed on, and I said, 'Well, [my son] is really upset.' I said, 'What did you do?'
>
> She said, 'Well, I sucked on the dog's penis.'
>
> Q. Did she actually use the word penis?
>
> A. Uh-huh."

In June, 1991, after eight months' imprisonment, Mother was released on parole. She began residing with her mother-in-law in Ray County. Daughter remained in foster care in Howell County.

On June 24, 1991, Mother and Ms. Coble of DFS signed a visitation contract and a family treatment plan. The visitation contract allowed Mother to visit Daughter one hour per month at the Howell County DFS office. The treatment plan provided for psychological evaluations of Mother and Kenneth, counseling sessions for them, and other DFS services. The treatment plan also provided: "Non-compliance will be reported to Court as a preliminary step to termination of parental rights."

On July 26, 1991, Daughter was readmitted to Lakeland Regional Hospital. Therapist Massey explained:

> "The second admission, [Daughter] ... stated many times that she was glad she was there, that she was glad she was getting help, that she did not want to return to [Mother's] home, that she wanted to return to her foster home with [the first foster mother], that she felt safe there....

That she understood ... she was in treatment because of being sexually abused, and that she had trouble dealing with that. And often, that was because of her behavior, one way it came out was because of her behavior....

We continued to recommend that she be placed in a foster home. And the foster home we recommended was [the first foster mother's] because [Daughter] was bonded to [her]. We also recommended that she have a great amount of structure and limits, and care and nurturance because we believed that she was in need of that to feel safe, to continue with her treatment. We also recommended that she be involved in individual therapy. We recommended as well that she not have any contact with her mother. And the reason we recommended that was because when she did have contact with her mother, she would become so out of control at Lakeland, and had so much anxiety that she would regress."

In September, 1991 (the date is unrevealed by the record), Mother moved from Ray County to Howell County, evidently unaccompanied by Kenneth.

On September 23, 1991, Mother and Ms. Coble of DFS signed a family treatment plan. It recited that Mother stated she was separated from Kenneth and she or he would be getting a divorce because he "verbally & physically abused [Daughter] and [Mother] failed to protect [Daughter] from the abuse & she does not wish this to happen again." The treatment plan provided for a psychological evaluation of Mother, monthly visits by Ms. Coble to Mother's home, and arrangements for Mother to visit Daughter.

On September 24, 1991, Daughter was discharged from Lakeland. She was returned to the home of the first foster mother.

On November 21, 1991, Alice Thompson, a social worker with the Howell County DFS office, interviewed Daughter in the presence of the first foster mother. This was apparently because of revelations by Daughter to the first foster mother. A transcription of the interview was received in evidence without objection at the termination hearing.

During the interview, Daughter disclosed Kenneth began performing cunnilingus on her when she was three years of age. On one such occasion, Mother unexpectedly entered and discovered what was occurring.

Daughter also revealed Kenneth had her perform fellatio on him. On one occasion, at a motel, Mother had Daughter perform fellatio on Kenneth.

Additionally, on a few occasions, Mother placed her hand on Daughter's genitalia. Daughter characterized Mother's acts as "playing around." As we understand the interview of November 21, 1991, the conduct described in this paragraph and the two preceding ones occurred intermittently while Daughter was between the ages of three and five.

On December 3, 1991, Ms. Thompson conducted a second interview of Daughter. This was in a school counselor's office. Ms. Coble was present. A transcription of the interview was received in evidence without objection at the termination hearing.

During the interview, Daughter disclosed Kenneth "whipped" her with a belt and a stick. Daughter also revealed Kenneth taught her to put her mouth on a pet dog's penis when she was age three. Additionally, Daughter repeated her earlier account of Mother "playing" with her "privates." At the end of the interview, Daughter stated she did not want to see Kenneth or Mother again.

The following day (December 4, 1991), Ms. Coble recommended to the juvenile officer that Mother's visits with Daughter be terminated.

In "early 1992," Mother returned to Ray County and resumed living with Kenneth. They were still living together there at time of trial.

On February 4, 1992, the juvenile officer commenced the instant proceeding to terminate parental rights.

In May, 1992, Mother's parole officer filed a violation report alleging a urine test revealed Mother had been using marijuana.

Around June 1, 1992, Mother was hospitalized at a "psychiatric" facility, where she remained until June 16, 1992.

On July 31, 1992, at the instance of DFS, Daughter began therapy with Donald McGehee, a psychologist with specialized training regarding children who have been sexually and physically abused. At time of trial (October 30, 1992), McGehee had seen Daughter on eight occasions.

McGehee diagnosed Daughter as having dysthymia and post-traumatic stress syndrome. Daughter told McGehee about sexual abuse by Kenneth and Mother, consistent with Daughter's revelations to Ms. Thompson on November 21, 1991, and December 3, 1991. McGehee concluded, "There is strong indication, in my opinion, that she has experienced what she is talking about."

During trial, the juvenile court excused Mother from the courtroom, and the court and counsel interviewed Daughter. Daughter revealed little, but did state Kenneth sometimes touched her "private parts" with his hand. Daughter also recalled the incident involving the dog at the foster home. Daughter indicated she did not want to see Mother or Kenneth because she was afraid.

Daughter was still in foster care at time of trial, and had not been in Mother's custody since the first admission to Lakeland, 27 months earlier.

In terminating Mother's parental rights, the juvenile court found, *inter alia*, that Daughter had been under the jurisdiction of the juvenile court for a period exceeding one year and the conditions which led to the assumption of jurisdiction still persisted, and that conditions of a potentially harmful nature continued to exist. That finding is responsive to § 211.447.2(3), quoted *supra*.

Specifically, the juvenile court found Mother had a long history of mental illness and drug abuse and had made little progress since 1988. The juvenile court further found Mother was on parole from her sentence for burglary and stealing, and in May, 1992, was found to be using marijuana. Additionally, the juvenile court found: "Given the mother's unsuccessful home life, unsuccessful counseling, permanent mental condition, drug use or

dependency, denial of the seriousness of these, and inability to meet the child's special needs, the Court is firmly convinced that the conditions which led to assumption of jurisdiction have not been rectified and that conditions of a potentially harmful nature continue to exist."

One of Mother's contentions, as we understand the argument following her point relied on, is that the record is unclear as to the conditions which led the juvenile court to assume jurisdiction over Daughter. Consequently, argues Mother, the evidence was insufficient to demonstrate such conditions still persisted or conditions of a potentially harmful nature continued to exist.

As reported *supra*, the petition of August 15, 1990, asking the juvenile court to take jurisdiction of Daughter alleged, among other things, that Daughter suffered physical abuse, or the threat thereof, from Kenneth, that Daughter had been hospitalized in 1988 and again in 1990 because of her behavior, and that Mother was unwilling or unable to provide a safe and secure environment for Daughter.

As we have seen, on September 13, 1990, Mother appeared with counsel in the juvenile court and confessed jurisdiction of that court over Daughter. While the cryptic record of that proceeding does not specify which allegations the court found to be true, the record clearly establishes that the court assumed jurisdiction over Daughter and placed her in the custody of DFS. Had Mother believed the juvenile court erred in proceeding as it did, she could have appealed the September 13, 1990, order. *In the Interest of M.D.S.*, 837 S.W.2d 338, 339[1] (Mo.App.W.D.1992). She did not.

As time passed after Daughter was removed from the home of Mother and Kenneth, the underlying cause of Daughter's aberrant behavior slowly emerged, culminating in her revelations of November 21, 1991, and December 3, 1991, to Ms. Thompson about the unspeakable sexual abuse, primarily by Kenneth but also by Mother. In its order terminating parental rights, the juvenile court found by clear and convincing evidence that deliberate acts of Mother and

Kenneth subjected Daughter to, and actually caused, substantial mental harm, and that Mother knew or should have known this to be the case. The juvenile court further found there was no chance that the abuse occurred without Mother's knowledge or participation.

Mother's position appears to be that inasmuch as Daughter's behavior slowly improved during the 27 months between the first hospitalization at Lakeland and the date of trial, the "conditions" which led the juvenile court to assume jurisdiction over Daughter no longer existed.

We disagree. As noted earlier, Mother and Kenneth were still residing together at time of trial. Mother testified she and Kenneth had "no contemplation for divorce."

Psychologist McGehee testified Mother's home was unsuitable; he recommended Daughter not return there. He quoted Daughter as saying, "I don't want [Mother and Kenneth] to do that stuff to me."

McGehee's testimony was consistent with that of therapist Massey, who recommended that Daughter have no contact with Mother because it would cause Daughter so much anxiety that her behavior would regress.

The family treatment plan of June 24, 1991, mentioned earlier, provided that Mother and Kenneth would attend individual counseling sessions arranged by DFS. Ms. Coble testified, "There is no record of them attending any counseling sessions arranged through our agency."

In sum, this is a case where Daughter's behavior was one of the conditions which led the juvenile court to assume jurisdiction over her. The cause of Daughter's behavior was ultimately found to be the sexual abuse described earlier in this opinion. The abuse was inflicted by Kenneth and, to a lesser extent, by Mother.

■ At trial, Kenneth denied sexually abusing Daughter. So did Mother. Mother also denied knowledge of sexual abuse of Daughter by anyone else. The juvenile court, however, was not required to believe that testimony. As the trier of fact, the juvenile court had leave to believe or disbe-lieve all, part or none of the testimony of any witness. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455[10] (Mo. banc 1984). The juvenile court's findings demonstrate it disbelieved Kenneth and Mother.

Clearly, the primary condition which led the juvenile court to assume jurisdiction over Daughter still existed at time of trial, i.e., the danger to which Daughter would be exposed if she were returned to the home of Mother and Kenneth, who inflicted the sexual abuse that caused the behavior for which Daughter was hospitalized, and for which she was still undergoing therapy at time of trial. The denial of such conduct by Kenneth and Mother, coupled with their failure to attend counseling sessions arranged by DFS, compellingly demonstrates there was no likelihood that this condition would be remedied at an early date.

Furthermore, at time of trial Daughter had been in foster care for more than two years and it was obvious—as found by the juvenile court—that continuation of the parent-child relationship greatly diminished Daughter's prospects for adoption, by which she could be integrated into a stable and permanent home.

■ An appellate court will affirm an order terminating parental rights unless there is no substantial evidence to support it, unless it is contrary to the weight of the evidence, or unless it erroneously declares or applies the law. *D.G.N. v. S.M.*, 691 S.W.2d 909, 912 (Mo. banc 1985). This standard of review is not inconsistent with the "clear, cogent and convincing" standard of proof required by § 211.447.2 in termination cases. *W.B.L.*, 681 S.W.2d at 454[2]. The latter standard is met when the evidence instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact finder's mind is left with an abiding conviction that the evidence is true. *Id.* at [4].

We hold there was substantial evidence to support the juvenile court's findings that Daughter had been under the jurisdiction of the juvenile court for a period exceeding one year, that the conditions which led to the assumption of jurisdiction still persisted, that conditions of a potentially harmful nature

continued to exist, that there was little likelihood that such conditions would be remedied at an early date so that Daughter could be returned to Mother in the near future, and that continuation of the parent-child relationship made adoption, and therefore integration into a stable and permanent home, impossible. Those findings satisfied the requirements for termination in § 211.447.2(3).

In determining whether to terminate parental rights under § 211.447.2(3), the juvenile court must consider and make findings on the factors set forth in subparagraphs (a) through (d) thereof, quoted *supra.* The juvenile court did so in this case. Mother maintains some of the findings lack the required evidentiary support.

■ Mother's argument is answered by *In re H.K.,* 762 S.W.2d 465 (Mo.App.W.D.1988). There, a parent argued that proof of only one of the factors in subparagraphs (a) through (d) of the 1985 version of § 211.447.2(3) [3] was insufficient to terminate parental rights. 762 S.W.2d at 469. The Western District of this Court held subparagraphs (a) through (d) of § 211.447.2(3) are merely factors to be considered under the ground for termination provided in § 211.447.2(3). 762 S.W.2d at 469[3]. Such factors are not separate grounds for termination in and of themselves, but rather categories of evidence to be considered together with all other relevant evidence. *Id.*

*H.K.* is consistent with *In the Interest of L.G.,* 764 S.W.2d 89 (Mo. banc 1989), *cert. denied,* 491 U.S. 909, 109 S.Ct. 3196, 105 L.Ed.2d 704 (1989), where the Supreme Court of Missouri reached the same conclusion regarding the factors set forth in subparagraphs (a) through (d) of § 211.447.2(2), RSMo 1986. The Supreme Court held that each of those factors constituted circumstances having a negative impact on the child and would, if found to exist, support termination. 764 S.W.2d at 94. Absence of any such factor would militate against termination, but would not preclude it. *Id.*

Here, responding to subparagraph (b) of § 211.447.2(3), the juvenile court found that the efforts of the juvenile officer and DFS had been unsuccessful in aiding Mother in adjusting her circumstances to provide a proper home for Daughter. Specifically, the juvenile court found those efforts had been frustrated by Mother's apparent unwillingness to cooperate, by her incarceration, and by her move to Ray County. The juvenile court concluded that where the failure of official assistance to a parent in adjusting circumstances to provide a proper home is attributable to the parent's negligence or obstinacy, such fact weighed in favor of termination of parental rights.

The juvenile court's eight-page order terminating parental rights painstakingly addresses all the factors the court was required to consider, and the order demonstrates the court took such factors into account in determining whether to terminate parental rights. That is all § 211.447.2(3) requires.

Mother's point relied on is denied.

The order terminating parental rights is affirmed.

FLANIGAN, P.J., and GARRISON, J., concur.

**3.** The 1985 version of § 211.447.2(3) was carried forward unchanged in the 1990 version, referred to in footnote 1, *supra.*