328 S.W.3d 238 (2010)
In the Interest of: T.A.L.
Juvenile Officer, Respondent,
v.
P.L.H. (Natural Mother), Appellant.
No. WD 71958.
Missouri Court of Appeals, Western District.
September 21, 2010.
Motion for Rehearing and/or Transfer to Supreme Court Denied November 2, 2010.
Application for Transfer Denied January 25, 2011.
*239 Joseph M. Page, Jefferson City, MO, for Appellant.
Samantha Anne Green, Jefferson City, MO, for Respondent.
Audrey Hanson, McIntosh, Jefferson City, MO, Guardian ad litem.
Before Division II: JOSEPH M. ELLIS, Presiding Judge, and ALOK AHUJA and KAREN KING MITCHELL, Judges.
KAREN KING MITCHELL, Judge.
This is a termination of parental rights case. The issue is whether there was clear, cogent, and convincing evidence that the conditions of section 211.447[1] were *240 met so as to trigger the trial court's authority to terminate the appellant's parental rights. We hold that there was not. Therefore, we reverse the trial court's judgment and remand for proceedings consistent with this opinion.

Facts and Procedural Background[2]
P.L.H. ("Mother") gave birth to T.A.L. ("Son") on March 15, 2001, in Belleville, Illinois. Thereafter, Mother and Son moved to Jefferson City, Missouri.

The Missouri Department of Social Service's Custody Over Son
In the summer of 2007, representatives of the State of Illinois contacted the Jefferson City Police Department regarding Mother. Mother had written a letter to officials at the State of Illinois's Department of Children and Family Services ("Illinois officials"), complaining of the treatment she received when the State of Illinois terminated her parental rights with respect to three other children. In the letter, Mother stated, among other threatening things, that she would become the "living nightmare" of the Illinois officials.
In light of the threatening nature of the letter, the State of Illinois asked the Jefferson City police to check on the status of Son. The police did so, and they reportedly found Mother's residence to be in an unsanitary condition"there were multiple items within easy access of the six-year-old including a razor, bleach, a can of insect repellant, beer, Nicorette gum, feces in the floor, and matches throughout the house which the juvenile had in his possession. Additionally, the toilet had not been flushed in several days." In addition, the police found that Son's father, K.C.H. ("Father"), was in the residence with Mother and Son. Father had been cited for domestic violence in the past, had been diagnosed as a paranoid schizophrenic, had been committed to a mental health institution, and had charges pending against him for domestic violence against Mother. The police took Son into emergency custody.
On August 22, 2007, the Family Court of Cole County, Missouri, Juvenile Division, assumed jurisdiction over Son. In doing so, the court noted the unsanitary conditions of the home and found that Father was incapable of providing care for Son due to his mental condition, also noting the domestic violence charges against Father. The court also noted that Son had special needs, "including a learning disability, ADHD, in addition to not speaking much," and that Mother had sent the letter to the Illinois officials and had "made odd statements to Jefferson City police officers about the book of [R]evelation[ ] in the Bible." The court made Son a ward of the court and placed him into the custody of the Missouri Department of Social Services, Children's Division ("Division"). The Division placed Son into a foster home, where he has resided since.

Team Meetings and Written Service Agreements
The Division's original goal was to reunite Mother and Son. The Division set monthly "team meetings" with Mother. Mother regularly attended these meetings. Initially, the Division prepared monthly Service Treatment Plans that assigned tasks to both Mother and the Division. These tasks appear to be focused on gathering information about Mother and stabilizing the situation. In November 2007, the Division and Mother began entering *241 into agreements that they called Written Service Agreements ("WSAs") at the monthly meeting. These agreements established goals and set tasks for Mother to complete. These goals and tasks changed somewhat over time, but at various times the Division established (either in the Service Treatment Plans or the WSAs) the following tasks for Mother:
1. Fully cooperate with and complete a psychological evaluation and follow all requests made by the evaluator;
2. Fully cooperate in completing a psychiatric evaluation;
3. Sign a release of information for Family Counseling Center and Social Security;
4. Fully cooperate with a drug and alcohol assessment;
5. Take all medications as prescribed;
6. Participate in counseling at Family Counseling Center, RACS,[3] Pathways and/or New Horizons;
7. Maintain safe, sanitary, and stable housing;
8. Work with "Voc-Rehab and Job Point";[4]
9. Maintain appropriate hygiene for her and Son;
10. Attend two to three Alcoholics Anonymous meetings a week;
11. Attend random drug tests;
12. Document her use of cold medicine;[5]
13. Attend a support group for victims of Post Traumatic Stress Disorder (by Mother's own decision);
14. Attend an anger management class (by Mother's own decision);
15. Complete a parenting assessment;
16. Not allow Father to reside in the home due to safety concerns.
The Division's Treatment Plans indicate that Mother participated in a psychological evaluation and a psychiatric evaluation shortly after Son became a ward of the court. The Division later required a second psychological evaluation. The February 2008 WSA indicates that the Division would schedule the second evaluation. Mother completed the second psychological evaluation on September 1, 2008, after failing to appear the first two times the Division had scheduled the evaluation. She signed all releases required by the Division. She participated in a drug and alcohol assessment. She self-reported that she took all medications as prescribed, and the juvenile officer did not contest this point.
Mother participated in counseling at the Family Counseling Center and RACS. The Family Counseling Center reported to the Division regarding Mother's progress as follows:
Effective this date [June 12, 2008], [Mother] has completed substance abuse and anger management counseling at the Family Counseling Center. In addition, [Mother] has been attending a weekly educational group for women who have survived traumatic experiences and struggle with substance abuse.
. . . .

*242 [Mother] has attended this group on a regular weekly basis and contributes to the discussion appropriately. At each session, members are asked to make a commitment for the following week. [Mother] not only completes her assignment weekly but eagerly shares her writings with the group.
I am very pleased with this client's progress. I am especially pleased that although [Mother] has accomplished her treatment plan goals, she has chosen to continue to participate in the weekly support group and work on healthy coping skills.
The Division's records indicate that there were attempts made to have Mother obtain counseling through Pathways and New Horizons. Pathways refused to reschedule counseling sessions with Mother after she failed to attend two scheduled appointments. The records also reflect that New Horizons was not a viable option for Mother because it refused to treat patients who had been diagnosed with depression.
With regard to maintaining a safe and stable home, Mother was not permitted to allow Father to reside with her (which she did not do) and was to maintain her home in a clean and sanitary condition.[6] Although, initially, Mother was able to maintain a clean home and her house never reached the level of uncleanliness that the police officers reported when they took Son into emergency custody, Lori Asi, a Child Services Worker with the Division, testified that Mother's cleanliness deteriorated over time. Specifically, Asi testified as follows:
After [Son] had first come into care, [Mother] had done a good job at getting her house cleaned back up and for a couple of months, you know, she was able to maintain. However, slowly, as time progressed, the house would become cluttered again. The kitchen counters would have food stains or drink stains. There would be dishes in the sink. I know the time that [another caseworker] and I were out at the home, [the other caseworker] had talked with [Mother] about calling Housing about the roach situation because there was roaches in the home. There may have been piles of laundry or garbage in the kitchen. The floor had not been mopped or swept. It may have had food stains on it, so over time the home got progressively dirtier.
With regard to Mother's hygiene, Asi testified that
[i]t would vary. There are days when [Mother] was very ... neatly dressed and you could tell she had, had taken time to take care of herself and, you know, there were other days when maybe her clothes would have been dirty or ... she had a body odor.[7]
Mother attended a meeting with "Voc-Rehab," but she did not succeed in finding permanent employment.[8] However, Mother receives disability benefits, and she made all of her child-support payments to the Division.
Records indicate that Mother attended a number of AA meetings between September 2007, when the WSA first listed this as a task Mother was to complete, and March *243 2008; however, it does not appear that Mother consistently met the two-to-three-meeting-per-week requirement during this time. In March 2008, Mother began refusing to attend AA meetings. Thereafter, Mother attended few (if any) AA meetings until March of 2009, when she began attending regularly. Both Mother and Asi testified that, at the time of trial, Mother had maintained sobriety for five months. Mother participated in random tests of her blood alcohol level; but, the trial court excluded the results of these tests as inadmissible hearsay. However, Asi testified that Mother failed some blood alcohol level tests and passed others. There was no evidence submitted regarding whether Mother documented her use of cold medicine.

Mother's visitation with Son
Mother had weekly visitations with Son, which were supervised by Division personnel, including Asi and Audrey Hanson McIntosh, guardian ad litem for Son. From August of 2007 until trial in June of 2009, Mother attended every weekly visit except one, though some of the meetings had to be rescheduled.
Asi testified that, at times during the visits, she had to tell Mother not to mention anything regarding Son coming home with her to live. Son mentioned that he thought the police would come to his foster home to take him back to Mother's residence, and Asi suspected that the idea had originated from Mother. A review of the Division's reports from the visitations reveals that, at times, Mother did not initiate enough contact with Son; she lacked focus during some of the visits; and she was not always able to manage Son's hyperactivity. Asi had to speak with Mother about the amount and nutritional content of the food she would bring for Son at the visits. Asi also wanted Mother to bring games to the meetings, but she testified that Mother did not do so; rather, Mother brought things like construction paper and beads for Son to construct necklaces.

Mother's ability to successfully parent
As noted, Mother underwent a psychological evaluation. Dr. David Baker, a psychologist, performed the tests and noted his impressions. His report, dated April 14, 2008, concluded as follows:
[Mother] demonstrated moderately impaired cognitive abilities (with the exception of intact grapho-motor coordination and speed). She demonstrated functional writing and calculation speed on rote tasks; however, mildly impaired reading comprehension skills were noted.
. . . .
Although depressive symptoms were not endorsed on the psychological measure, several areas of moderate concern (e.g. mood variability, paranoia, delusional beliefs, unstable self image, and egocentricity) were noted. Moreover, threatening statements [referring to the letter to the Illinois officials] ... demonstrate impaired judgment and indicate aggression and impulse control to be areas of significant concern. Should a pervasive pattern of antisocial behaviors ... be noted, a diagnosis of Antisocial Personality Disorder should be considered. Finally, although [Mother] denies current alcohol use, her history of substance abuse and reported unwillingness to attend twelve-step groups suggest the possibility of continued alcohol abuse. Consequently, we recommend that [Mother] be closely monitored for indications of possible alcohol abuse.
In summary, the available evidence indicates that [Mother] is not currently capable of providing a stable and nurturing environment for [Son], particularly in light of his apparent need for specialized care. ... As preconditions for any *244 future reviews, we believe that [Mother] should demonstrate a prolonged period of emotional stability (e.g., at least two years) as evidenced by ongoing medication compliance and satisfactory progress in therapy (as indicated by her therapist), regular attendance (e.g., at least weekly) at twelve-step meetings and compliance with alcohol testing (e.g., a breathalyzer test), absence of further legal incidents, and no additional threatening messages (in verbal and/or written form) towards Children's Division staff. Should custody be restored to [Mother] at any point in the future, we strongly recommend that her emotional stability and overall living situation be monitored by Children's Division staff on an ongoing basis and that particular attention be given to any special care needed by [Son].
Baker testified that, if Mother followed the "preconditions" listed in his report, he "would look favorably on [Mother's] ability to parent" Son. Mother did not fully comply with Baker's preconditions to reunification. As noted above, Mother did not consistently attend AA meetings throughout the period following Son's removal from the home. In addition, as addressed more fully below, Mother sent threatening letters to Division employees.
The Division also arranged for Mother's intelligence to be tested. Dr. Richard Lillard conducted the test and found that Mother's intelligence was "well below what would be considered average for her peers, but above the level required for any potential diagnosis of mental retardation." Lillard diagnosed Mother with "Borderline Intellectual Functioning." Lillard's report concluded that Mother's intelligence quotient would be unlikely to change in the future. However, Lillard testified that Mother's low IQ, standing alone, would not prevent her from being able to parent Son.
McIntosh, guardian ad litem for Son, testified as follows:
[Mother's] inability to follow through, having the consistency, having the mental health things in place, again, I believe those prevent the natural mother being able to provide what [Son] needs in order to grow and prosper and do well and so, therefore, it is my recommendation that it is in [Son's] best interest that the natural mother's rights also be terminated.
With regard to Mother's ability to be a successful parent to Son, Asi testified as follows:
I think as far as [Mother's] psychiatric issues, not being open to accept services, not willing to work with other agencies to help her in order to maintain some stability, make sure that she gets to her appointments on time. I just feel she wouldn't be able to properly take care of [Son] or assess his needs.

More threatening letters and the petition for termination of parental rights
In July of 2008, the Division changed its permanency goal for Mother and Son from "reunification" to "adoption."
On December 22, 2008, Mother sent a letter to a Division official that stated "you don't know what I am capable of doing at all." On February 13, 2009, Mother sent a letter to Asi that made several statements that could be and were considered threatening. She stated that a certain friend of hers (who apparently the Division had concerns about her seeing) was "not going to put up with your nonsense." She stated that her friend was "no city folk you are dealing with[,] and you[']r[e] dealing with a[ ] hillbilly country boy now. He is not going to play your stupid games." She stated further that "you think you had problems before[;] now you will have them... I am not going to hold it in much *245 longer[;] everyone is going to find out now I can only put up with so much."
The Division received the February 13, 2009 letter on February 17, 2009, and the juvenile officer of Cole County, Missouri (the Respondent here), filed a petition to terminate Mother's parental rights the next day.

Trial and Judgment
On June 12, 2009, the Family Court of Cole County, Juvenile Division, held a trial on the juvenile officer's petition. On November 24, 2009, the court entered its judgment, terminating Mother's parental rights. In its judgment, the court found that the conditions that led to the court's assumption of jurisdiction persisted, conditions of a potentially harmful nature existed, and there was little likelihood that the conditions will be remedied at an early date so that the child can be returned to the parent in the near future. Specifically, the court found that Mother and the Division had entered into the WSAs and that the plans had not aided Mother
in adjusting her circumstances or conduct to provide a proper home for the child in that:
(1) The Mother has failed to address her psychiatric issues since [Son] came into Children's Division custody in August 2007;
(2) The Mother has not successfully maintained sobriety and refuses to attend AA meetings or other treatment to demonstrate that she no longer abuses alcohol or to aid her in resolving her addiction;
(3) The Mother does not regularly attend team meetings at the Children's Division;
(4) The Mother has attended visitation with [Son], but her visitations are not beneficial to [Son's] well-being in that the Mother does not focus on [Son's] needs during the visitation.
However, the court went on to find that the juvenile officer had not put on sufficient evidence to show that "Mother has a long-term addiction to alcohol which impairs her ability to care for herself and her children and that the Mother has failed and/or refused to successfully complete treatment for her alcohol addiction." As such, the court made no finding with respect to Mother's alleged chemical dependency.
In addition, the court found that Mother has a
current mental condition which poses a danger to the well-being of [Son]. The Mother refuses and/or has failed to obtain regular mental health treatment. The Mother has been diagnosed and treated in the past for depression. The Mother has participated in a psychological evaluation and IQ evaluation in which several areas of concern were noticed including "mood variability, paranoia, delusional beliefs, unstable self image, and egocentricity." The assessment suggested that the Mother should be considered for a diagnosis of Antisocial Personality Disorder. The assessment concluded that the Mother is not capable of providing a stable and nurturing environment for [Son]. The Mother's IQ evaluation concluded that the Mother's intellectual ability is unlikely to change in any significant way.
The court also found that terminating Mother's parental rights was in Son's best interests. The court then entered judgment, terminating Mother's parental rights. This appeal follows.

Standard of Review
In a termination proceeding, the circuit court, before considering the child's best interest, must determine *246 whether or not the grounds for termination are supported by clear, cogent, and convincing evidence. Evidence supporting termination is clear, cogent, and convincing if, when weighed against all of the evidence, it instantly tilts the scales in favor of termination. We review the circuit court's judgment by determining whether or not it is supported by substantial evidence, is consistent with the weight of evidence, or accurately declares and applies the law.
In the Interest of C.K., 221 S.W.3d 467, 471 (Mo.App. W.D.2007). "It has been said that the clear, cogent and convincing standard requires that the matter under consideration be established by the clearest of evidence, and upon testimony entirely exact and satisfactory." In the Interest of A.M.C., 983 S.W.2d 635, 640 (Mo.App. S.D. 1999). While it is true that we review the evidence in the light most favorable to the judgment of the trial court, it is also true that the evidence supporting termination must be clear, cogent, and convincing, "`instantly tilt[ing] the scales in favor of termination when weighed against the evidence in opposition.'" Juvenile Officer v. P.S.L. (In the Interest of T.A.S.), 62 S.W.3d 650, 655 (Mo.App. W.D.2001) (quoting Juvenile Officer v. R.H. (In the Interest of A.H.), 9 S.W.3d 56, 59 (Mo.App. W.D.2000)) (emphasis added). This clear, cogent, and convincing standard must be considered when determining whether the trial court's judgment is supported by substantial evidence or is against the weight of the evidence. Therefore, we must consider evidence both favorable and unfavorable to the trial court's judgment. See J.O. v. Taney Cnty. Juvenile Office (In the Interest of D.O.), 315 S.W.3d 406, 408 (Mo. App. S.D.2010).
We review orders terminating parental rights closely because such orders infringe upon a fundamental rightthe right to raise one's child. Id. at 414; see also Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("[T]he interest of parents in the care, custody, and control of their childrenis perhaps the oldest of the fundamental liberty interests recognized by this Court."). "The fundamental liberty interest of natural parents in raising their children does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the State." In the Interest of K.A.W., 133 S.W.3d 1, 12 (Mo. banc 2004). Denying a parent the right to raise her child is an awesome power, and courts should not exercise it lightly. C.K., 221 S.W.3d at 471. Indeed, our Supreme Court has made clear that we are to review the termination of parental rights cases closely, strictly construing all statutes in favor of preserving the parent-child relationship. K.A.W., 133 S.W.3d at 12.
For appeals that turn on evidentiary determinations made pursuant to section 211.447.5(3), we must determine whether the trial court's finding that there was clear, cogent, and convincing evidence proving one of the statutory bases is supported by substantial evidence and whether it is against the weight of the evidence. See C.K., 221 S.W.3d at 471.
We review the trial court's conclusion as to whether termination is in the best interests of the child under section 211.447.6 for abuse of discretion. In the Interest of P.L.O., 131 S.W.3d 782, 789 (Mo. banc 2004).

Legal Analysis
In her sole point on appeal, Mother argues that the trial court erred in finding that there was clear, cogent, and convincing evidence that would establish a statutory basis for terminating her parental rights. We agree.
*247 Section 211.447.6 permits the trial court to terminate parental rights only if it finds that one or more statutory bases for termination exist under subsections 2, 4, or 5 of section 211.447. Id. at 788.
Here, the statutory basis for the trial court's termination of Mother's parental rights was section 211.447.5(3), which reads as follows:
The juvenile officer or the division may file a petition to terminate the parental rights of the child's parent when it appears that one or more of the following grounds for termination exist:
. . . .
(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.
Under this statute, the trial court must make three separate findings: (1) the child has been under the jurisdiction of the juvenile court for at least one year; (2) the conditions that led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist; and (3) there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In the Interest of K.K., 224 S.W.3d 139, 150 (Mo.App. S.D.2007). "A judgment terminating parental rights must be based upon more than past conditions. Regardless of the past, [termination of parental rights] requires the trial court to determine that the parent is currently unfit ... to be a party to the parent-child relationship." In the Interest of C.W., 211 S.W.3d 93, 98 (Mo. banc 2007) (internal quotation marks omitted). In other words, the trial court may not terminate a parent's rights on the basis of past conduct, unless that conduct is continuing and is likely to harm the child in the future. Id.
The trial court cannot simply find, in conclusory fashion, that the statutory prerequisites to termination exist. A.P.K. v. Crawford Cnty. Juvenile Officer (In the Interest of K.T.K.), 229 S.W.3d 196, 201 (Mo.App. S.D.2007). Rather, the legislature has listed a number of factors that the trial court must use in making these findings. Section 211.447.5(3)(a)-(d) directs the trial court to consider the following:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot *248 be treated so as to enable the parent to consistently provide such care, custody and control[.]
Proof of any one of these four factors ("relevant factors") is sufficient to establish the trial court's authority to terminate a parent's rights. In the Interest of C.F.C., 156 S.W.3d 422, 427 (Mo.App. E.D. 2005). However, there must be clear and convincing evidence of at least one of these factors. Juvenile Officer v. D.M.M. (In the Interest of J.M.), 815 S.W.2d 97, 102 (Mo.App. W.D.1991).
Section 211.447.7 further directs the trial court, when considering a termination of parental rights under section 211.447.5(3), to consider the following:
(1) The emotional ties to the birth parent;
(2) The extent to which the parent has maintained regular visitation or other contact with the child;
(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;
(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;
(5) The parent's disinterest in or lack of commitment to the child;
(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;
(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.
In this case, we hold that there was no clear and convincing evidence that any of the section 211.447.5(3) factors were present. Accordingly, we need not address the trial court's findings under section 211.447.7, for the absence of the section 211.447.5(3) factors mandates reversal. J.M., 815 S.W.2d at 102.[9]

1. Section 211.447.5(3)(d)
With respect to section 211.447.5(3)(d), the trial court found there was insufficient evidence that Mother had a chemical dependency on alcohol or any other drug. As noted, the absence of one of the relevant factors militates against terminating parental rights, though it does not decide the issue. Beevers v. M.J.H. (In the Interest of T.M.E.), 874 S.W.2d 552, 560 (Mo. App. S.D.1994).

2. Section 211.447.5(3)(a) & (b)
The trial court found that Mother had failed to comply with the WSAs and that Mother had not benefited from the Division's services.[10] The trial court's finding that Mother had failed to make progress in complying with the WSAs is against the weight of the evidence and is not supported by substantial evidence. *249 See Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976).
With respect to compliance with the WSAs, "[t]he issue is whether or not progress has been made toward complying with the service agreements-not whether or not the compliance was full or substantial." In the Interest of C.N.G., 109 S.W.3d 702, 707 (Mo.App. W.D.2003).

a. Attendance at psychological counseling
The trial court found that Mother had not complied with the WSAs in that she had "failed to address her psychiatric issues." This finding is against the weight of the evidence and is not supported by substantial evidence. See Murphy, 536 S.W.2d at 32.
The juvenile officer's evidence regarding Mother's compliance with the WSAs came primarily from Asi, who testified that Mother had failed to avail herself of the psychiatric services that the Division had made available to her. Evidence was presented regarding Mother's participation in counseling. Initially, the Division's plan was for Mother to obtain counseling services from Family Counseling Center. It is not clear why, but at some point that plan changed. Mother was directed to obtain services from Pathways or New Horizons, which are presumably counseling programs, even though she was already undergoing counseling through Family Counseling Center. At trial Asi testified that Mother had attended Pathways and New Horizons but that those programs now refused to see Mother because she attended infrequently. The record reveals that Pathways had refused to continue Mother's treatment because she had missed two appointments. When Pathways refused to see Mother, the WSA changed to require Mother to obtain counseling through New Horizons. But entries in subsequent WSAs indicate that Mother did not qualify to obtain services through New Horizons because that program purportedly did not treat individuals who had been diagnosed with depression. Even after it became clear that Pathways and New Horizons would not provide services, the WSAs continued to require Mother to seek services from one of these two providers. The evidence was undisputed that Mother attended services at Family Counseling Center and that her counselor there was "very pleased" with her progress. The evidence was also undisputed that Mother regularly attended RACS.
Asi also testified that the Division encouraged Mother to meet with a psychiatrist and that Mother did so, though not on a consistent basis. However, the juvenile officer presented no evidence from Mother's treating psychiatric counselors or her psychiatrist to establish whether Mother was making progress with her "psychiatric issues."
Among the "psychiatric services" listed on the WSAs and/or Service Treatment Plans are attendance at a psychological and a psychiatric evaluation. Records reflect that Mother completed both evaluations and an intelligence test. Moreover, it was undisputed that Mother, on her own initiative, attended anger management classes and support group sessions for victims of Post Traumatic Stress Disorder. The WSAs also state that Mother was to visit Dr. Choudhry, a psychiatrist, to receive medication. As noted, Asi testified that Mother did so, but "not on a consistent basis." However, the juvenile officer presented no evidence that would establish how consistent, or inconsistent, Mother's attendance was at her appointments with Choudhry and no evidence to refute Mother's self-reporting that she was compliant in taking medications.
*250 This evidence does not clearly, cogently, and convincingly establish that Mother had failed to make progress in addressing her psychiatric needs as contemplated by the WSAs. See C.N.G., 109 S.W.3d at 707. Thus, we hold that the evidence with regard to Mother's progress in "addressing her psychiatric issues" does not "instantly tilt[ ] the scales in favor of termination," and the trial court erred in terminating Mother's parental rights on this basis. See C.K., 221 S.W.3d at 471.

b. Maintaining sobriety and attending AA meetings or other treatment
The trial court also found that Mother had not complied with the WSAs in that she "has not successfully maintained sobriety and refuses to attend AA meeting or other treatment to demonstrate that she no longer abuses alcohol or to aid her in resolving her addiction." This finding, too, is not supported by substantial evidence and is against the weight of the evidence. See Murphy, 536 S.W.2d at 32.
Importantly, the trial court's finding on this point is somewhat inconsistent with the trial court's other findings. That is, in its findings with respect to section 211.447.5(3)(d)chemical dependencythe trial court found that the juvenile officer had not presented sufficient evidence to establish that Mother has a "a long-term addiction to alcohol" and had not presented sufficient evidence to establish that "Mother has failed and/or refused to successfully complete treatment for her alcohol addiction." While these findings are not directly inconsistent with the trial court's finding that the juvenile officer had presented sufficient evidence that Mother "has not successfully maintained sobriety and refuses to attend AA meeting or other treatment," they are somewhat contradictory.
Moreover, the evidence is insufficient to support the conclusion that Mother failed to successfully maintain sobriety. The trial court sustained an objection to blood alcohol level reports, and thus the results of random drug tests are not part of the record. Asi testified that Mother had failed some of these tests and had passed others, but, given that her testimony was based on the records of the blood alcohol tests, which were excluded as hearsay, her testimony, standing alone, does not meet the "clear, cogent, and convincing" standard. Moreover, Mother testified, and Asi verified, that Mother had maintained sobriety in the five months before trial.
As to treatment for alcohol abuse, the records admitted at trial reflect that Mother attended a number of AA meetings between September 2007 and March 2008. While in March 2008 Mother began refusing to attend AA meetings, the evidence was undisputed that Mother had attended AA meetings regularly from March of 2009 until the date of trial. In February of 2009, the court appointed Kurt Valentine as Mother's guardian ad litem ("GAL"). Valentine testified that, when he was appointed, Mother did not fully understand the role of the Division but rather viewed the Division's relationship to her as a combative one. When he explained the situation to her more fully, she adopted a more cooperative posture and began attending AA regularly.
The evidence was also undisputed that Mother received counseling for alcohol abuse at Family Counseling Center. Cf. C.N.G., 109 S.W.3d at 709 (holding that the trial court's findings were insufficient to warrant termination in part because the trial court found that the parent had not attended a "12-step program" even though she had attended alternative therapy). Asi conceded that Mother completed a substance abuse program at Family Counseling *251 Center, but she stated that "the [Division] team was not aware of this," despite having received a letter from Family Counseling Center in June of 2008, which had apprised Asi of Mother's progress. We also note that the juvenile officer presented no evidence that Mother's alleged alcoholism had ever caused Mother to abuse or neglect Son.
Based on this record, we hold that there was no clear, cogent, and convincing evidence to support terminating Mother's parental rights on this basis.
Accordingly, we hold that the evidence with regard to Mother's progress in maintaining sobriety and attending AA or other treatment therefore does not "instantly tilt[ ] the scales in favor of termination," and the trial court erred in terminating Mother's parental rights on this basis. See C.K., 221 S.W.3d at 471.

c. Attendance at team meetings
The trial court also found that Mother had failed to comply with the WSAs in that "Mother does not regularly attend team meetings at the Children's Division." There is no evidence to support this finding.
Asi testified that Mother regularly attended team meetings. In closing argument, the juvenile officer conceded that Mother consistently attended team meetings. The juvenile officer presented no other evidence on this point, apart from the team meeting notes, which confirm that Mother regularly attended the meetings. Thus, the evidence regarding Mother's attendance at team meetings unequivocally supported Mother's case, and therefore the trial court erred in terminating Mother's parental rights on that basis.

d. Visitation
The trial court also found that Mother had failed to comply with the WSAs in that, although she attended visitation with Son, visitation had not benefited Son because she did not focus on Son's needs. The trial court also found that "visitation has not assisted in establishing an emotional bond between Mother and child." These findings are against the weight of the evidence.
The evidence demonstrated that there is an emotional bond between Mother and Son. The only two witnesses who testified regarding the visitationsAsi and McIntosh unequivocally affirmed that this bond exists. Asi testified that Son is always happy to see Mother. She testified that, at first, he had trouble "transitioning" when the visit was over but that, now, he is also happy to leave and does not have this "problem." A review of the Division's reports from the visitations reveals that the Division's most common complaint was that Mother hugged and kissed Son too vigorously.
Likewise, there was insufficient evidence that Mother did not focus on Son's needs at the visitations. Again, the juvenile officer relied on Asi's testimony to establish this point. Asi's complaints regarding the meetings were either trivial (Mother brought construction paper and beads for Son to play with instead of games), commonplace (at times, Son, a boy between the ages of seven and nine, became hyperactive during the visits), or otherwise deficient, considering the "clear, cogent, and convincing" standard (Mother had to be redirected regarding the amount and nutritional content of Son's food; Mother had to be redirected not to mention Son coming home).[11]
*252 By contrast, the actual visitation notes from the Division's case file indicate that Mother did focus on Son's needs. Among other positive comments, the notes state that: "Parent initiates contact"; "Parent and child hug each other"; "Parent smiles at child"; "Parent and child have eye contact"; "Parent is attentive to child's needs"; "Parent lets child know what child is allowed/not allowed to do"; "Parent initiates communication"; "Parent listens to child's communication"; "Child smiles at parent"; "Parent asks child about everyday activities (school, play, etc.)"; "Child appears/expresses that he/she is excited/happy to visit (before and after visit)"; "Parent praises and encourages child"; and "Parent provides hope and reassurance at end of visit for the next scheduled visit."
Certainly, there are also concerns expressed in the visitation notes, including that at times there is little interaction between Mother and Son, that Mother becomes distracted by other things (filling out forms and interacting with Division staff) and does not focus all of her attention on Son, and that Mother seems to have difficulty in addressing Son's hyperactivity. But looking at all of this evidence, we cannot say that there was clear, cogent, and convincing evidence to support the trial court's finding that visitation did not establish an emotional bond between Mother and Son and/or that Mother did not focus on Son's needs at the visitations. See C.K., 221 S.W.3d at 471. Given the lack of evidence that the visitations failed to benefit Son, the trial court's findings on this point were against the weight of the evidence, and the court erred to the extent it terminated Mother's parental rights on this basis. Id.

3. Section 211.447.5(3)(c)
The trial court found that Mother's mental condition was sufficient to warrant termination under section 211.447.5(3)(c). In doing so, the court misapplied the law. See Murphy, 536 S.W.2d at 32. Further, the court's conclusion was unsupported by substantial evidence and was against the weight of the evidence. See id.
As noted above, section 211.447.5(3)(c) requires that the trial court consider whether a parent suffers from a mental condition that (1) is either permanent or unlikely to improve and (2) prevents the parent from being able to "knowingly provide the child the necessary care, custody and control."
Here, although the court found that Mother had a mental condition that poses a danger to Son's well-being, it made no finding that Mother's mental condition would prevent her from being able to "knowingly provide [Son] the necessary care, custody and control." And, even if the court's judgment could be said to implicitly find that Mother's mental condition prevented her from adequately parenting Son, the evidence does not support such a finding. The only "mental conditions" at issue were a dependency on alcohol, depression, and Antisocial Personality Disorder. As noted above, the court found that the evidence regarding Mother's dependency on alcohol did not meet the required evidentiary threshold. Moreover, there was no evidence that would tie Mother's depression to a current inability to parent, as is required for termination under section 211.447.5(3)(c). C.W., 211 S.W.3d at 100-01. Further, there was no evidence that Mother actually had Antisocial Personality Disorder. Baker's report stated only that such a diagnosis should be considered if a "pervasive pattern of anti-social *253 behaviors" were ever noted in Mother. Given that Baker never actually noted any such "pervasive pattern of anti-social behaviors," the court should not have relied on that statement in Baker's report. Accordingly, the trial court erred in terminating Mother's parental rights on the basis of her mental condition because the court did not specifically find, and the evidence did not support, that any mental condition of Mother's would prevent her from knowingly providing Son the necessary care, custody, and control. § 211.447.5(3)(c).
Moreover, the trial court made a finding with regard to Mother's ability to improve, but, in doing so, it misapplied the law by focusing on the wrong issue. The court found that Mother's intelligence was "unlikely to change in any significant way" not that her psychological problems were permanent or unlikely to improve.[12] The trial court based its conclusion on Lillard's report, which found that Mother's IQ was not likely to improve. However, Mother's inability to improve her IQ does not warrant termination of her parental rights. Lillard testified that IQ is "relatively fixed" as a general matter. In other words, Mother is not unique in her inability to change her IQ "in any significant way"; indeed, she is typical in that respect. Further, this is not a case where the parent's IQ is so low as to render it impossible for her to "knowingly provide the child the necessary care, custody and control." See § 211.447.5(3)(c). Lillard testified that Mother's "IQ itself would not be something that I could say would preclude her from being able to parent her children." Since Mother's IQ does not prevent her from being able to parent Son, the trial court erred in terminating Mother's parental rights on the basis of her inability to improve it.
Thus, the trial court failed to find that Mother's mental condition prevented her from being able to "knowingly provide [Son] the necessary care, custody and control," and it failed to find that Mother's psychological problems were permanent and/or unlikely to improve. See § 211.447.5(3)(c). Accordingly, the court erred in terminating Mother's parental rights on the basis of Mother's mental condition.

Conclusion
There was no clear, cogent, and convincing evidence to support the trial court's conclusion that elements of section 211.447.5(3) were met. All of the court's specific findings with regard to the relevant factors were either (1) favorable to Mother; (2) unsupported by substantial evidence and/or against the weight of the evidence; or (3) the result of a misapplication of the law. Lacking sufficient evidence of any of the relevant factors, the trial court had no authority to terminate Mother's parental rights. J.M., 815 S.W.2d at 102.
Our ruling does not mandate that the circuit court return physical custody of Son to Mother. D.O., 315 S.W.3d at 424. Based on this record, it may be difficult for Mother to improve so that reunification with Son is possible. And even if reunification is possible at some point in the future, it may be that Mother will always need help in raising Son; however, that Mother needs help does not mandate termination of her parental rights. C.W., 211 S.W.3d at 101. Absent a finding that continuing *254 Mother's parental rights as she works toward reunification would adversely affect Son's chances of achieving a permanent home, an issue on which no evidence was presented and the trial court made no finding, the record does not support termination of parental rights at this time. Terminating a parent's right to raise her child requires more, and, until the required showing has been made, Mother's parental rights must remain intact. K.A.W., 133 S.W.3d at 12. We reverse the trial court's judgment and remand for proceedings consistent with this opinion.
JOSEPH M. ELLIS, Presiding Judge, and ALOK AHUJA, Judge, concur.
NOTES
[1] Statutory references are to RSMo 2000, as updated through the 2009 cumulative supplement.
[2] On appeal from a judgment terminating parental rights, we view the evidence in the light most favorable to the judgment. In the Interest of K.A.W., 133 S.W.3d 1, 11-12 (Mo. banc 2004).
[3] The record is silent on this point, but we assume that RACS stands for Rape and Abuse Crisis Service.
[4] The record is silent on this point, but we assume that these are programs designed to help their participants find employment.
[5] The Division required Mother to document her use of cold medicine in conjunction with monitoring her alcohol intake.
[6] The requirement that Mother maintain a clean home does not appear on the WSAs from April of 2008 onward.
[7] The requirement that Mother maintain a proper hygiene does not appear on the WSAs from April of 2008 onward.
[8] The requirement that Mother attend vocational support services does not appear on the WSAs from April of 2008 onward.
[9] We note, however, that the court found a number of the section 211.447.7 factors in Mother's favor. For example, Mother had made her child-support payments to the Division, had not been found guilty of a felony that would destabilize Son's home-life, and had not committed a deliberate act that would endanger Son.
[10] The trial court seems to have found that Mother did not benefit from the Division's services because she did not comply with the WSAs. Accordingly, we will address these factors together.
[11] Asi's suspicion that Mother had mentioned having the police forcibly bring Son back home was purely speculative and was therefore entitled to little (if any) weight.
[12] We note that, with regard to Mother's psychological problems, Baker's psychological report expressly contemplated the potential for improvement. Moreover, Baker testified that, if Mother met the preconditions listed in his report, he would "look favorably on [Mother's] ability to parent."