In the Interest of: A.L.M., K.M.M., M.J.C.M., and R.K.M., Minors,

D.L.M., Natural Father, Appellant,

v.

Greene County Juvenile Office, Respondent.

Nos. SD 30837 to SD 30840.

Missouri Court of Appeals, Southern District, Division Two.

May 25, 2011.

Application for Transfer to Supreme Court Denied June 14, 2011.

---

Kristoffer R. Barefield, Springfield, MO, for Appellant.

Bill Prince, Springfield, MO, for Respondent.

WILLIAM W. FRANCIS, JR., Judge.

D.L.M. ("Father") appeals the respective judgments terminating parental rights to his minor children, A.L.M., K.M.M., M.J.C.M., and R.K.M. (collectively referred to as the "Children").[1] Finding no merit to Father's points, we affirm the judgments of the Juvenile Division of the Circuit Court of Greene County (the "trial court").[2]

## Factual and Procedural History

█ While our recitation of the relevant facts is generally in accordance with the principle that the evidence is viewed in the light most favorable to the judgment, *see In re C.A.M.,* 282 S.W.3d 398, 401 (Mo. App. S.D.2009) and *In re M–R–F–,* 907 S.W.2d 787, 789 (Mo.App. S.D.1995), we also cite opposing evidence because grounds for termination must be supported by evidence that "instantly tilts the scales in favor of termination *when weighed against the evidence in opposition* and the finder of fact is left with the abiding conviction that the evidence is true." *In the Interest of K.A.W.,* 133 S.W.3d 1, 12 (Mo. banc 2004) (emphasis added).

On July 31, 2008, the Greene County Juvenile Office ("Juvenile Office") received a report that Father had committed an act of elderly abuse toward his mother and was abusive toward his son, A.L.M. The family was living with Father's mother at the time. Following this incident, the Children were temporarily placed in the custody of Father's sister.

Isabella Escudero ("Ms. Escudero"), an investigator for the Children's Division of the Missouri Department of Social Services (the "Children's Division"), initially met with Father in jail where he denied assaulting his mother, but did not com-

---

1. The individual cases for each child were consolidated for this appeal. A petition was filed on behalf of each child and a separate judgment was entered with respect to each child. The judgments also terminated the parental rights of the Children's mother ("Mother"). As Mother is not a party to this appeal, we make no decision regarding the propriety of the trial court's termination of her parental rights and refer to evidence about Mother only as necessary to address Father's appeal.

2. Our use of the term "trial court" is meant to represent the proceedings conducted before Commissioner Chester B. Hayes ("Commissioner") on June 16, 2010, whose findings and recommendations were subsequently adopted and entered as the "Final Judgment" by Circuit Judge David C. Jones on August 16, 2010.

ment about the allegations related to his abuse of the Children. Ms. Escudero again met with Father on August 4, 2008, following his release from jail. At that time, Father was without a residence. Father indicated his intent to move in with his sister but due to the placement of his four Children there, his sister's three children residing there, and the small housing arrangement, this was not an appropriate solution. Although Ms. Escudero suggested local shelters, Father reported he did not want his Children in a shelter. At the conclusion of their conversation, there was still no permanent place to relocate the Children.

Ms. Escudero also met with the Children and determined the Children had unmet medical needs. Specifically, M.J.C.M. had club feet and hands that required medical attention, and all the Children had rotten teeth. When Ms. Escudero initially met with A.L.M. and R.K.M., R.K.M. was silent about what had gone on in the parental home, while A.L.M. reported he did not want to talk because he was afraid of Father.

On August 4, 2008, the decision was made to take custody of the Children because of Father's inadequate housing, alleged physical and verbal abuse, domestic violence, medical and hygiene neglect, and parental drug use.

On September 15, 2008, the Children's Division prepared a "Treatment Plan" ("the Plan") for Father with respect to all four Children. It included sixteen items of responsibility for Father and was designed to help Father make the changes necessary to allow him to be reunited with the Children. For ease of understanding and analysis, we focus initially on the Plan's requirements and Father's results in connection with it.

The Plan's first requirement provided Father would begin and complete a substance abuse assessment as soon as available, follow all recommendations from the assessment counselors, and provide proof of completion and progress to the Children's Division each month. Father has never provided verification of completion of such an assessment. Father did not take any steps to comply with this provision until seventeen months after the Children were taken into the custody of the Juvenile Office and he was incarcerated. During his incarceration, Father participated in a short-term substance abuse program at Cremer Therapeutic Community Center from January 4, 2010 to March 27, 2010, for which he received a certificate of completion. Upon release from jail, Father testified he completed a drug assessment at the request of his probation officer. He also testified he was scheduled to participate in a program through Sigma House but had not started it as of the date of trial.

The second Plan requirement provided Father would not use illegal drugs and would take random drug tests in a timely manner as requested. Father failed a drug test on October 1, 2008. On August 20, 2008, April 2, 2009, and April 14, 2009, rather than submit to a drug test, Father simply admitted ahead of time that his results would indicate illegal drug use. Father admitted to having used methamphetamine and marijuana as recently as April 2009, almost one year after the Children were removed from his care. Father's most recent drug test on June 7, 2010, was negative.

The third Plan requirement provided Father would obey all local, state and federal laws. On May 21, 2009, Father was charged with "DWI Drug Intoxication" to which he pled guilty on July 20, 2009. On September 16, 2009, Father was charged with a second "DWI–Drug Intoxication" to which he pled guilty on November 10,

2009. Father was arrested on November 10, 2009, on a probation revocation for a previous conviction of possession of methamphetamine, which Father had pled guilty to on January 10, 2008, and received four years' imprisonment, a suspended execution of sentence, and five years' supervised probation. In 2009, Father's parole officer reported Father was not consistent and did not check in regularly.

The Plan's fourth requirement provided Father would attend a support group (e.g., Narcotics Anonymous). Again, Father participated in a program only while he was incarcerated.

The Plan's fifth and sixth requirements provided Father would complete a psychological evaluation, follow all recommendations, and attend therapy. On October 31, 2008, Father received a psychological evaluation from Dr. Mark Bradford ("Dr. Bradford"). Father had previously missed two appointments for the evaluation. Based on that examination, Dr. Bradford diagnosed Father as suffering from Dysthymic Disorder, having a history of cannabis dependence and methamphetamine abuse, partner relational problem, and adult antisocial behavior. Father reported to Dr. Bradford a history of drug usage. He also reported that he had used as recently as August 2008, causing Dr. Bradford to note Father did not have a "long enough clean drug history" as of October 2008. Dr. Bradford further noted he was inclined to give Father a full diagnosis of antisocial personality based upon the history of violence, fighting, and irresponsible behavior. Dr. Bradford recommended drug treatment for six to twelve months.

Father initially attended therapy sessions with Steve Reiutz ("Mr. Reiutz"), a licensed counselor, on October 9, 2008, and then, without explanation, did not return until April 30, 2010. Mr. Reiutz also saw Father on May 7, 2010 and May 20, 2010.

Father did not call or show up for his May 28, 2010 appointment, or subsequent appointments. Father has not provided verification of successful completion of therapy.

The seventh Plan requirement was that Father maintain a safe, stable and clean residence, and cooperate with home visits by the Children's Division. Between August 2008 and November 2009, Father moved from place to place, staying with friends. Father did not provide an address to his caseworker other than in October 2008, he advised he was residing at his grandmother's address and could receive mail there. Father was incarcerated from November 2009 to March 24, 2010, and again from March 26, 2010 to April 15, 2010. After his incarceration, Father resided with Mother at his mother-in-law's address. At trial, Father said that he had recently inherited approximately $28,000, and that he intended to purchase a suitable residence within a month, although he wanted to take time to make an appropriate decision.

The eighth Plan requirement provided Father would report any changes in the household, treatment services, problems complying with the Plan, and would provide a reliable phone number. The caseworker testified Father did not provide this information until April 15, 2010, shortly after his release from jail.

The Plan's ninth requirement provided Father would attend all meetings at the Children's Division or make other arrangements. Father attended some of the meetings but not all. No meetings were scheduled subsequent to Father's release from jail.

For the Plan's tenth requirement, the Plan provided Father would sign all release-of-information forms when requested and be honest at all times. Father was

compliant with signing releases, but was not honest with the team at all times.

The eleventh Plan requirement provided Father would maintain a legal and stable income and provide proof to Children's Division. Prior to his incarceration, Father informed his caseworker he was working, but did not provide proof of income. Father testified he started a job detailing cars in May 2010.

The Plan's twelfth requirement required Father to pay child support each month or, if support was not ordered, provide toys and clothing. As of October 23, 2009, Father was not current in his child support. As of June 16, 2010, the date of the trial, it was uncertain whether Father was current or not. Father did get Temporary Assistance for Needy Families and daycare assistance started for the children. Father also obtained Medicaid for the children, and also obtained disability benefits for his disabled child. Father also brought items for the Children during visitations and sent gifts with Mother while he was incarcerated.

The Plan's thirteenth requirement provided Father would attend any scheduled appointments or assessments for any of the Children, if asked to attend. Father was never asked to attend because "[Father] has not made enough progress for the team to feel comfortable allowing him to attend these types of appointments."

For the Plan's fourteenth requirement, Father was required to attend parenting classes. Father attended parenting classes, but was dismissed from the program prior to completion due to his number of absences. Father made attempts to rejoin the program but was not permitted to do so because the only program item remaining was a parent/child visit, which was not recommended by the Plan team.

The Plan's fifteenth requirement required Father attend all scheduled visitations with the Children. Therapeutic visits were scheduled for every other Friday from May 2009 through August 2009. Father, however, only attended three visits. Luther Young ("Mr. Young"), a provisional licensed professional counselor, supervised these visitations between Father and the Children. Concerns noted by Mr. Young included Father interacting more with the older children than the younger children, and Father making promises to the Children about their return home. Father had not visited the Children since approximately July 2009. Visits were stopped on therapist recommendation due to Father's inconsistency and the negative impact the visits were having on the Children. Resuming visitations was contingent on Father's progress at therapy.

The final Plan requirement provided Father not allow anyone in the household who would pose a threat to themselves or any of the Children. The caseworker had concerns with the Children residing in a home with Mother and Father's mother-in-law due to a past history of abuse and neglect. However, the caseworker also testified she was unsure if Father had violated this requirement.

On August 26, 2009, the Juvenile Office filed petitions to terminate Father's parental rights based on Father's abuse and/or neglect of the Children and Father's failure to rectify.

On June 16, 2010, at the termination of parental rights hearing, the Juvenile Office called ten witnesses, including Ms. Escudero, Dr. Bradford, and Mr. Young, as well as a number of therapists who had been providing services to some of the Children.

Linda Smith ("Ms. Smith"), a psychologist, evaluated A.L.M., R.K.M. and M.J.C.M. A.L.M. was referred to Ms. Smith because his behavior in the foster

home was disruptive, including having temper tantrums, hitting his siblings, stealing, acting sneaky and showing food issues. She saw signs of a developing mood disorder, possible bipolar, mood disorder, and a developing oppositional defiant disorder. Ms. Smith diagnosed A.L.M. as suffering from reactive attachment disorder and found it unusual that he had few memories of home. Ms. Smith reported, however, A.L.M. did recall moving a lot, living in poverty, having no heat and observing Father and Mother "beat each other up." Ms. Smith concluded A.L.M. would need intensive help in school, therapeutic help with sibling relationships, and would need stability to deal with his various issues.

Ms. Smith also evaluated R.K.M. She diagnosed R.K.M. as suffering from reactive attachment disorder and was concerned he was demonstrating symptoms consistent with autism. Ms. Smith suggested the child and the child's caretaker participate in an autism treatment program. Ms. Smith evaluated M.J.C.M. as well. M.J.C.M. had minimal communication skills and had obviously been through significant trauma in his life. Ms. Smith suspected that due to M.J.C.M.'s night terrors and the fact that he was hypervigilant, that he was suffering from post-traumatic stress disorder ("PTSD"). Ms. Smith noted that M.J.C.M. required structure, nurturing, and love.

Kara Davis ("Ms. Davis"), a licensed professional counselor, who saw M.J.C.M. from February 2009 through December 2009, testified she agreed M.J.C.M. was suffering from generalized anxiety disorder and PTSD.

Robert Grant ("Mr. Grant"), a licensed professional counselor, saw A.L.M. and M.J.C.M. in 2009 and 2010. During his work with A.L.M., the child made progress in behavior skills and communication skills.

Mr. Grant attributed part of this to the hard work of A.L.M.'s foster parents and the consistency they provided to A.L.M. Mr. Grant noted A.L.M. would be angrier, more withdrawn, and visibly upset when Father did not show up for a scheduled visit.

Alison Brawner ("Ms. Brawner"), a licensed professional counselor, had been working with R.K.M. since February 2010, and with M.J.C.M. since May 2010. Ms. Brawner noted that R.K.M. had been dealing with some abandonment issues. Ms. Brawner reported she had difficulty getting R.K.M. to talk about his parents; however, overall R.K.M. had been doing better with his communication skills and his autistic tendencies were improving. Ms. Brawner had been working with M.J.C.M. on issues related to anxiety. She attributed much of their improvement to feeling safe and secure in their current environment.

Claire Merello ("Ms. Merello") was the Children's Division caseworker who worked with the family from August 5, 2008, through the date of trial. Ms. Merello testified that Father's issues included physical abuse, domestic violence, medical and hygiene neglect, and substance abuse.

Father also testified on his own behalf. Father indicated he had been employed since May 6, 2010, and he had recently inherited money which he intended to use to obtain stable housing for himself and the Children. There was no indication Father had made any substantial expenditures as of yet to rectify the needs of the Children. Father also testified he was in compliance with his probation requirements.

On August 16, 2010, the trial court terminated Father's parental rights. The trial court found that the Juvenile Office had proved both neglect, pursuant to section

211.447.5(2),[3] and failure to rectify, pursuant to section 211.447.5(3). Additionally, the trial court concluded it would be in the best interests of the Children to terminate Father's parental rights. Father filed his notices of appeal on September 24, 2010.

In three points relied on, Father contends the trial court erred in finding: (1) Father abused and/or neglected the Children; (2) the Children had been under the jurisdiction of the juvenile court for a period of one year and harmful conditions persisted; and (3) termination was in the Children's best interests. The Juvenile Office contends the evidence established grounds for termination and it was in the Children's best interests. The primary issues for our determination are:

1. Was there clear, cogent and convincing evidence to demonstrate one or more grounds for termination of parental rights as set forth in section 211.447.5?

2. Did the trial court abuse its discretion in finding that the totality of circumstances demonstrated it was in the Children's best interests to terminate Father's parental rights?

### Standard of Review

■ Whether a statutory ground for termination has been proven by clear, cogent and convincing evidence is reviewed under the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the trial court's judgment terminating a parent's parental rights unless no substantial evidence supports it, it is contrary to the weight of the evidence, or it erroneously declares or applies the law. *In re P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004).

**3.** All references to section 211.447 are to RSMo Cum.Supp. (2009), unless otherwise

■ A trial court's best-interest determination must be based on a preponderance of the evidence. *In the Interest of D.M.B.*, 178 S.W.3d 683, 689 (Mo.App. S.D. 2005). "We review this finding under an abuse of discretion standard." *Id.* at 689–90. The trial court's discretion is abused " 'when it is so clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.' " *Id.* at 690 (quoting *In re E.D.M.*, 126 S.W.3d 488, 497 (Mo.App. W.D.2004)).

■ "In our review, we are mindful that the [trial] court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony." *In re B.C.K.*, 103 S.W.3d 319, 322 (Mo.App. S.D.2003). Conflicting evidence is viewed in the light most favorable to the trial court's determination. *In re C.A.M.*, 282 S.W.3d at 405. "The termination of parental rights is an awesome power that involves fundamental liberty interests associated with family and child rearing"[;] therefore, "we review the record very closely to ensure this awesome power was properly exercised." *In re L.M.*, 212 S.W.3d 177, 181 (Mo.App. S.D.2007) (internal citation omitted). "Statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *In re K.A.W.*, 133 S.W.3d at 12.

### *Grounds for Termination of Parental Rights*

Father claims there was insufficient evidence to support the trial court's findings

indicated.

that clear, cogent and convincing evidence supported termination of parental rights based on the grounds of neglect, pursuant to section 211.447.5(2), and failure to rectify, pursuant to section 211.447.5(3). We need only find one of these statutory bases was sufficiently proven to sustain the judgment. § 211.447.5; *See In re N.R.W.*, 112 S.W.3d 465, 469 (Mo.App. W.D.2003). Because there is sufficient support for a finding that Father failed to rectify the harmful nature of the conditions for the Children, we need only address Father's allegations of error based on this ground. Specifically, Father contends there was insufficient evidence to support a finding of failure to rectify in that the evidence adduced at trial indicated "Father had obtained employment, had inherited a sum of money sufficient to purchase suitable housing for the minor children, and was, at the time of trial, in compliance with the terms of his probation, including drug treatment." We disagree.

### Analysis

■ Termination of parental rights for failure to rectify is permissible when the following elements of section 211.447.5(3) are satisfied: (1) the child has been under the jurisdiction of the juvenile court for a period of one year; (2) the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist; and, (3) there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. § 211.447.5(3); *see also In the Interest of B.J.K. and J.R.K.*, 197 S.W.3d 237, 243 (Mo.App. W.D.2006). In this determination, the trial court is required to consider and make findings on the following factors:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

Section 211.447.5(3)(a)–(d).

■ The factors listed in subsections (a) through (d) are simply categories of evidence to be considered along with other relevant evidence; they do not constitute separate grounds for termination in and of themselves. *In re L.M.*, 212 S.W.3d at 182. Nevertheless, proof of one such factor is sufficient to support termination on the statutory ground of failure to rectify. *Id.*

Here, the trial court found all three required elements and specifically noted Father's "complete failure to obtain a suitable residence where he could provide care for the [Children] and [his] lack of stable employment until one month prior to the trial." Father acknowledges that

while the evidence presented at trail [sic] might support a finding that these issues existed at the time the trial court took jurisdiction over the children, and perhaps for a period of time leading up to trial, the evidence indicated that at the time of trial and for the immediate future, Father would be able to provide a suitable home and had obtained suitable employment.

Father points to his testimony that he had been employed detailing cars for the last five weeks and had inherited $28,000. He argues this "would provide him the means to purchase a suitable residence, which he intended to do within the month." We do not find this evidence is indicative that Father would be more likely to provide for the needs of the Children. Father's general assurances that he had the means to provide for the Children, if true, are outweighed by his persistent inaction in providing for the Children.

 Father is correct that it is insufficient merely to point to past acts, note that they resulted in abuse or neglect, and then terminate parental rights. *In re K.A.W.*, 133 S.W.3d at 9–10. "Past behavior can support grounds for termination, but only if it is convincingly linked to predicted future behavior. There must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm." *Id.* (internal footnote omitted). For example, a parent's efforts to comply with a treatment plan will provide the court with an indication of a parent's likely efforts in the future to care for the child. *In re D.O.*, 315 S.W.3d 406, 417 (Mo.App. S.D.2010). " 'Such evidence cannot be irrelevant and it is error for a trial court to ignore it when considering termination of parental rights.' " *Id.* (internal quotations and citation omitted).

Here, there was substantial evidence of Father's continued failures to take steps to comply with the Plan, and the evidence regarding Father's change in circumstances at the time of trial did not demonstrate that Father would in fact meet the Children's emotional and physical needs in the immediate future. Despite Father's five weeks of employment and his significant inheritance, at the time of trial, Father *still* had not procured suitable housing where he could provide care for the Children. Father's past and current failure to maintain a suitable residence, suggests these future promises would likely not come to fruition as "a parent's past patterns provide vital clues about present and future conduct." *In re E.F.B.D.*, 245 S.W.3d 316, 327 (Mo.App. S.D.2008). We also note, even since being employed, there is no evidence Father has contributed financial or in-kind support to the Children, further showing his continued failure to provide financial support.

The fact Father is currently employed and represented he inherited money, does not automatically mean he *will* provide in the future; there was no evidence presented as to Father's inability to provide at least minimal support while the Children were in the juvenile court's custody, excluding his incarceration. In fact, the October 23, 2009 "Termination of Parental Rights Court Summary," indicated Father was previously working for different roofing companies and as an independent home remodeler; yet, this did not translate to Father actually providing stable housing or providing in any other way for the Children. Apart from Father's incarceration, the record discloses no reason Father was incapable of employment or was physically unable to provide at least in part for his Children. In the absence of such evidence, Father can be considered financially able to support the Children. *In re A.H.*, 9 S.W.3d 56, 60 (Mo.App. W.D.2000). Thus, Father's current em-

ployment status and his inheritance, do not indicate he will now or in the immediate future automatically provide for the Children's needs, especially since he was considered financially able to support the Children (except during his incarceration) while they were in the jurisdiction of the juvenile court but failed to do so.

Additionally, we look at Father's ability to care for these four children. These children have been diagnosed with serious mental disorders and physical impairments that require stability, structure, and commitment to provide intensive help in school, medical treatment, and on-going therapy, none of which Father has been able to provide. Additionally, the evidence suggests this would be his continued pattern of behavior as Father has failed to meet the requirements set forth in the Plan specifically designed to help him make the necessary changes to reunite with the Children. Furthermore, the trial court correctly noted Father "has failed and refused to avail himself of agency-sponsored parenting classes and substance abuse evaluation which would place him in a position to be a caregiver for his [Children]." The trial court went on to note that Father only successfully performed items on the Plan while incarcerated. "A lack of effort to comply with a plan, or a lack of success despite effort, can predict future problems." *In re K.A.W.*, 133 S.W.3d at 10.

After a thorough review of the record, we find the trial court's finding that clear, cogent and convincing evidence supported the termination of Father's parental rights, based on his failure to rectify, is sufficiently supported by the record. Father's point is denied.

### Best Interests Determination

■ Finally, Father contends the trial court erred in finding it was in the Children's best interests to terminate his parental rights because "Father visited the [C]hildren when he was not incarcerated, wrote the [C]hildren 37 letters while incarcerated, was engaged in drug treatment at the time of trial, and demonstrated his love and commitment to the [C]hildren." After a careful review, we conclude there was no abuse of discretion in the trial court's best-interests finding.

■ Determining a child's best interest is a subjective assessment based on the totality of the circumstances. *In the Interest of C.A.M.*, 282 S.W.3d at 409. Section 211.447.7 provides the trial court with seven factors to consider when determining whether termination of the parent-child relationship is in the best interest of a child.[4] "There is no requirement, statutory or otherwise, that all seven of these

4. Those factors are:
 (1) The emotional ties to the birth parent;
 (2) The extent to which the parent has maintained regular visitation or other contact with the child;
 (3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division . . . ;
 (4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;
 (5) The parent's disinterest in or lack of commitment to the child;
 (6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;
 (7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.
 § 211.447.7(1)–(7).

factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination." *Id.* at 409.

First, Father points to the trial court's finding under factor (2) that Father has not maintained regular visitation "due to [F]ather's refusal to cooperate and unexplained 'disappearances.' Father appeared for 50 percent of his scheduled visits. Father's unexplained failures to appear for visits had a negative emotional impact on the [Children]." Father specifically argues his incarcerations made it impossible for him to attend visitations and the trial court made no reference to the 37 letters he sent to the Children during his incarceration.

While incarceration alone is insufficient to terminate parental rights, (*see* section 211.447.6(6)), this was far from the trial court's sole reason for finding in favor of termination. Also, Father is attempting to excuse his poor visitation record because of his incarcerations. Father, however, was not incarcerated when he missed the scheduled visits cited in the judgment, nor did his incarcerations prevent him from using the five months in which he was not incarcerated (three months prior to his incarceration and two months after) to take the steps necessary for visitations to resume following the therapist-recommended discontinuation of visitations.[5] While Father did keep in contact with his children when he was incarcerated, his inconsistent record of keeping in contact when he was not incarcerated is significant. Mr. Young testified to the negative impact Father's missed visitations had on the Children. Thus, even when considering the letters Father sent to the Children, the trial court did not abuse its discretion

in finding this factor weighs against Father.

Father further argues the trial court is punishing him for being incarcerated because none of Father's convictions the trial court took judicial notice of were felony convictions. Section 211.447.7 specifically requires the trial court, under factor (6), to consider the conviction of the parent of a felony offense that would deprive the child of a stable home for a period of years provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights. Under this factor, the trial court made reference to Father's judicially noticed convictions even though they were not felony offenses. Nevertheless, the trial court did not find this factor weighed against Father. In fact, it noted Father was currently out of jail on probation.

It was, however, permissible for the trial court to have considered Father's continued volitional criminal activity, which Father now complains inhibited his ability to provide for the physical and emotional needs of his children; the limitation is that "incarceration in and of itself shall not be grounds for termination of parental rights[.]" § 211.447.7(6). It was appropriate to look at Father's volitional criminal behavior that prevented the Children from receiving appropriate parenting from Father. *See In re A.P.S.*, 90 S.W.3d 232, 235 (Mo.App. S.D.2002).

With respect to factor (3), the trial court found: "[F]ather ha[s] failed to consistently provide financial or in-kind support. No evidence was presented of the lack of ability on the part of [Father] to provide at least minimal or token in-kind or financial support on a regular basis." Father ar-

---

5. While Father did initially resume therapy with Mr. Reiutz following his release; however, on May 28, 2010, Father failed to show for his scheduled session and made no attempt to resume therapy thereafter.

gues the burden of proof regarding Father's ability to provide financial and in-kind support falls upon the Juvenile Office. However, as noted *supra*, it is a permissible inference for the trial court to find that in the absence of evidence that Father was not financially able, he was financially able. *See In re A.H.*, 9 S.W.3d at 60. Father did not consistently provide in-kind support to the Children[6] and pay child support when the Children were not in his home. Although verification was never provided, Father also told Ms. Merello that he was working, further showing his failure to provide despite being able to do so. We also look to the five weeks prior to trial where Father was employed and find no evidence that he offered any support during this time period. The mere fact that Father has inherited $28,000, and his future promise to provide, does not indicate he will in fact provide in the future.

Father also confuses the Juvenile Office's closing suggestion that there is no evidence Father does not love his Children as evidence contrary to the trial court's finding that Father's behaviors indicate a lack of commitment to the Children. Under these circumstances, the trial court did not abuse its discretion in concluding Father's behavior evidenced a lack of commitment to the Children in that he did not maintain consistent visitation, did not adhere to the established Plan he signed, and did not obtain suitable housing.

Upon review of the entire record, we do not find the trial court's decision was so clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. The following evidence supports the trial court's decision.

The testimony of the psychologists showed the ties the Children had to Father were unhealthy as three of the Children were suffering from emotional issues including reactive attachment disorder and PTSD. The Children have made great progress on their emotional and behavioral issues since being in a stable placement. Additionally, Father's visitation with the Children has been inconsistent and there has been no contact with the Children since July 2009, as Father has not completed the necessary therapy to recommence visitations. Further, Father did not provide financial support and only provided limited in-kind support to the Children; there was no evidence presented of an inability on Father's part to provide at least minimal consistent support. Father's lack of commitment, and disinterest in the Children, was evident in his general failure to comply with the Plan (with the exception of minor steps generally taken while he was incarcerated), and his failure to maintain a consistent relationship with the Children. Finally, Father was provided with a multitude of services to assist him in making the necessary changes so that he could be reunited with his children and there is no evidence of additional services that would enable him to resume care of the Children. Thus, we cannot say the trial court's decision was an abuse of its discretion. Father's point is denied.

Accordingly, the judgments of the trial court are affirmed.

SCOTT, C.J., and BATES, J., Concur.

---

6. Although Ms. Merello reported Father brought items for the Children—snacks and Christmas presents—section 211.447.8 makes clear the trial court may attach little or no weight to such efforts. *See also In re C.A.M.*, 282 S.W.3d at 409.